**No. 22-40786**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**NETFLIX, INC.,**

*Plaintiff-Appellee*,

v.

**LUCAS BABIN,**

*Defendant-Appellant.*

**On Appeal from the United States District Court
for the Eastern District of Texas, Lufkin Division,
No. 9:22-CV-00031-MJT**

**BRIEF OF *AMICI CURIAE*, TEXAS ASSOCIATION OF BROADCASTERS, TEXAS PRESS ASSOCIATION, TEXAS TRIBUNE, FREEDOM OF INFORMATION FOUNDATION OF TEXAS, THE AMERICAN BOOKSELLERS FOR FREE EXPRESSION, ASSOCIATION OF AMERICAN PUBLISHERS, INC., THE AUTHORS GUILD, THE CATO INSTITUTE, THE CENTER FOR INVESTIGATIVE REPORTING, FIRST AMENDMENT FOUNDATION, INC., FOX TELEVISION STATIONS, LLC, FREEDOM OF THE PRESS FOUNDATION, FREEDOM TO READ FOUNDATION, THE INSTITUTE FOR POLICY INNOVATION, INTERNATIONAL CENTER FOR LAW & ECONOMICS, THE MEDIA COALITION FOUNDATION, THE MEDIA INSTITUTE, THE MEDIA LAW RESOURCE CENTER, MOTION PICTURE ASSOCIATION, INC., NATIONAL COALITION AGAINST CENSORSHIP, NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, NEWS/MEDIA ALLIANCE, PENGUIN RANDOM HOUSE LLC, THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, AND TULLY CENTER FOR FREE SPEECH, IN SUPPORT OF PLAINTIFF-APPELLEE**

Laura Lee Prather
Michael J. Lambert
HAYNES AND BOONE, LLP
600 Congress Avenue, Suite 1300
Austin, Texas 78701
Telephone: (512) 867-8400
laura.prather@haynesboone.com
michael.lambert@haynesboone.com
*Attorneys for Amici Curiae*

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

Pursuit to Fifth Circuit Rules 28.2.1 and 29.2, the undersigned counsel certifies that, in addition to the persons and entities listed in the parties' briefs, the following listed persons and entities have an interest in the outcome of this case.

### Amici Curiae

Texas Association of Broadcasters
Texas Press Association
Texas Tribune
Freedom of Information
Foundation of Texas
The American Booksellers for
Free Expression
Association of American
Publishers, Inc.
The Authors Guild
The Cato Institute
The Center for Investigative
Reporting
First Amendment Foundation, Inc.
Fox Television Stations, LLC
Freedom of the Press Foundation

Freedom to Read Foundation
The Institute for Policy Innovation
International Center for Law & Economics
The Media Coalition Foundation
The Media Institute
The Media Law Resource Center
Motion Picture Association, Inc.
National Coalition Against Censorship
National Press Photographers Association
News/Media Alliance
Penguin Random House LLC
The Reporters Committee for Freedom of
the Press
Tully Center for Free Speech

### Counsel for Amici Curiae

Laura Lee Prather (Haynes and Boone, LLP)
Michael J. Lambert (Haynes and Boone, LLP)

*/s/ Laura Lee Prather*
Laura Lee Prather

i

# **TABLE OF CONTENTS**

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS........................ i

TABLE OF CONTENTS........................................................................... ii

TABLE OF AUTHORITIES ................................................................. iv

CORPORATE DISCLOSURE STATEMENT ...................................... viii

SOURCE OF AUTHORITY TO FILE ...................................................1

STATEMENT OF INTEREST OF AMICI CURIAE.................................1

INTRODUCTION ................................................................................12

SUMMARY OF ARGUMENT .............................................................13

ARGUMENT ......................................................................................16

I.      Federal courts must be available to vindicate fundamental First Amendment rights in the face of unconstitutional bad-faith criminal prosecutions that deprive defendants of immediate state court remedies. ...................................................................................16

    A.      The repeated prosecutions, delay tactics, and unsubstantiated charges against Netflix display a pattern of bad faith. ...................... 16

        1.      Netflix initially faced charges under Texas Penal Code § 43.262 despite extensive exculpatory evidence.................... 16

        2.      After months of delays, Netflix faced a second set of charges under Texas Penal Code § 43.25, a more serious law, in response to its petitioning activity. .............................. 19

    B.      Federal courts play a critical role in safeguarding First Amendment rights from abuse by state actors. .................................. 21

    C.      The circumstances of this case demand federal court review............ 22

II. The criminal prosecution of Netflix unconstitutionally chills the dissemination and receipt of a broad spectrum of First Amendment protected speech...........................................................................................24

    A. Permitting a criminal prosecution of Netflix under these circumstances would encourage bad-faith prosecutions of protected speech. ................................................................................ 24

    B. The District Attorney's prosecution unconstitutionally chills Netflix's speech and that of countless other speakers........................ 26

        1. The District Attorney's prosecution unconstitutionally chills Netflix's speech............................................................. 26

        2. The District Attorney's prosecution unconstitutionally chills a broad spectrum of protected speech. ........................... 28

    C. The prosecution of Netflix infringes the public's right to receive information............................................................................ 35

CONCLUSION.................................................................................................36

CERTIFICATE OF COMPLIANCE.......................................................................38

CERTIFICATE OF SERVICE ..............................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ashcroft v. Am. Civil Liberties Union*,
    535 U.S. 564 (2002)...........................................................................26

*Citizens United v. Fed. Election Comm'n*,
    558 U.S. 310 (2010)...........................................................................32

*Cohen v. California*,
    403 U.S. 15 (1971)........................................................................24, 25

*Cooper v. Aaron*,
    358 U.S. 1 (1958)..............................................................................24

*Daniel v. Waters*,
    515 F.2d 485 (6th Cir. 1975) ...........................................................21

*Dombrowski v. Pfister*,
    380 U.S. 479 (1965)......................................................................22, 34

*Elrod v. Burns*,
    427 U.S. 347 (1976)...........................................................................27

*Gutierrez v. State*,
    307 S.W.3d 318 (Tex. Crim. App. 2010) .........................................23

*Jenkins v. Georgia*,
    418 U.S. 153 (1974)...........................................................................18

*Joseph Burstyn, Inc. v. Wilson*,
    343 U.S. 495 (1952)...........................................................................25

*Lamont v. Postmaster Gen. of U.S.*,
    381 U.S. 301 (1965)......................................................................35, 36

*Ex parte Lowry*,
    639 S.W.3d 151 (Tex. App.—Houston [1st Dist.] 2021,
    pet. granted) ......................................................................12, 14, 18, 19

*Martin v. City of Struthers*,
   319 U.S. 141 (1943) ....................................................................35

*McLin v. Ard*,
   866 F.3d 682 (5th Cir. 2017) .................................................27

*Mills v. Alabama*,
   384 U.S. 214 (1966) ....................................................................22

*Mutual Film Corp. v. Indus. Comm'n of Ohio*,
   236 U.S. 230 (1915) ....................................................................25

*Near v. State of Minnesota ex rel. Olson*,
   283 U.S. 697 (1931) ....................................................................36

*Netflix, Inc. v. Babin*,
   No. 9:22-CV-00031, 2022 WL 16948603 (E.D. Tex. Nov. 14, 2022) ..19, 20, 27

*New York v. Ferber*,
   458 U.S. 747 (1982) .............................................................15, 21

*Opulent Life Church v. City of Holly Springs, Miss.*,
   697 F.3d 279 (5th Cir. 2012) .................................................28

*Smith v. People of the State of California*,
   361 U.S. 147 (1959) .............................................................35, 36

*State v. Morgan*,
   160 S.W.3d 1 (Tex. Crim. App. 2004) ..............................23

*Texas v. Johnson*,
   491 U.S. 397 (1989) .............................................................15, 25

*United States v. Alvarez*,
   567 U.S. 709 (2012) .............................................................32, 33

*Washington Post Co. v. Keogh*,
   365 F.2d 965 (D.C. Cir. 1966) .............................................24

*Wilson v. Thompson*,
   593 F.2d 1375 (5th Cir. 1979) .............................................27

*Younger v. Harris*,
    401 U.S. 37 (1971)....................................................................................17, 21

## Statutes and Rules

28 U.S.C. § 1331 ............................................................................................21

Fed. R. App. P. 26.1(a) ................................................................................ viii

Fed. R. App. P. 29(a)(2)...................................................................................1

Fed. R. App. P. 29(a)(4)...................................................................................1

Tex. Penal Code § 43.25 .........................................................................*passim*

Tex. Penal Code § 43.262 .......................................................................*passim*

Tex. Code Crim. P. 11.15 ...............................................................................23

Fifth Cir. R. 28.2.1 ..........................................................................................1

Fifth Cir. R. 29.2 .............................................................................................1

## Other Authorities

Betsy Reed, *Alanis Morissette says she was victim of multiple statutory*
    *rapes as a teenager*,
    THE GUARDIAN, Sept. 13, 2021 .........................................................32

Caitlin Dickerson, *We need to take away children*,
    THE ATLANTIC, Aug. 7, 2022 ..............................................................30

Caroline Kitchener, *This Texas teen wanted an abortion. She now has twins*,
    THE WASHINGTON POST, June 20, 2022 ............................................30

Connie Walker, *Stolen: Surviving St. Michael's*,
    GIMLET MEDIA, May 17, 2022....................................................30

Daniel Fienberg, *'Pretty Baby: Brooke Shields' Review: A Timely Doc*
    *About Hollywood, Hyper-Sexualization and a Star's Resilience*,
    THE HOLLYWOOD REPORTER, Mar. 31, 2023.....................................33

Kenneth Dickerman, *'I know that there will probably always be an anorexic part inside of me, but there is also one that fights for life, and won't tire of doing so'*,
THE WASHINGTON POST, Feb. 24, 2020 .............................................................29

Megan Beauregard, *7 Memoirs from Stars Who Overcame Childhood Hardships*,
BOOKTRIB, Oct. 27, 2022 ..................................................................................31

Morgan Smith, Neena Satija, & Edgar Walters, *SOLD OUT: How the crusade against sex trafficking in Texas has left child victims behind*,
THE TEXAS TRIBUNE, Feb. 13, 2017 ..................................................................32

Nick Ut, *The Terror of War* (photograph),
National Gallery of Art, June 8, 1972..................................................................28

Nick Ut, *"The Terror of War": 50 Years Later*,
THE PULITZER PRIZES, June 6, 2022..................................................................29

Stephanie Foo, *What My Bones Know*,
Feb. 21, 2023......................................................................................................31

Stephen Simpson, *For migrant children who cross the border alone, a new set of challenges getting health care awaits*,
THE TEXAS TRIBUNE, Apr. 26, 2023 ..................................................................32

*Students, parents protest sex trafficking, call for safer streets in South Los Angeles*,
CBSNews.com, Jan. 6, 2023..............................................................................32

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Fox Television Stations, LLC is an indirect, wholly owned subsidiary of Fox Corporation, which is its ultimate parent company and is publicly traded. No publicly held corporation other than Fox Corporation owns ten percent or more of Fox Television Stations, LLC.

Penguin Random House LLC is a limited liability company whose ultimate parent corporation is Bertelsmann SE & Co. KGaA, a privately-held company. 80.9 percent of the capital shares in Bertelsmann SE & Co. KGaA are held indirectly by foundations (Bertelsmann Stiftung, Reinhard Mohn Stiftung, BVG-Stiftung), and 19.1 percent are held indirectly by the Mohn family. All voting rights at the General Meeting of Bertelsmann SE & Co. KGaA and Bertelsmann Management SE (general partner) are controlled by Bertelsmann Verwaltungsgesellschaft (BVG).

Pursuant to Fed. R. App. P. 26.1(a), the undersigned counsel certifies that all other Amici Curiae are not publicly held corporations, do not have any parent corporation, and no publicly held corporation owns 10 percent or more of any corporation's stock.

*/s/ Laura Lee Prather*
Laura Lee Prather

## SOURCE OF AUTHORITY TO FILE

Pursuant to Fed. R. App. P. 29(a)(2), counsel for Plaintiff-Appellee and Defendant-Appellant have consented to the filing of this brief.

## STATEMENT OF INTEREST OF AMICI CURIAE

This brief is filed on behalf of the Texas Association of Broadcasters, Texas Press Association, Texas Tribune, Freedom of Information Foundation of Texas, The American Booksellers for Free Expression, Association of American Publishers, Inc., The Authors Guild, The Cato Institute, The Center for Investigative Reporting, First Amendment Foundation, Inc., Fox Television Stations, LLC, Freedom of the Press Foundation, Freedom to Read Foundation, The Institute for Policy Innovation, International Center for Law & Economics, The Media Coalition Foundation, The Media Institute, The Media Law Resource Center, Motion Picture Association, Inc., National Coalition Against Censorship, National Press Photographers Association, News/Media Alliance, Penguin Random House LLC, The Reporters Committee for Freedom of the Press, and Tully Center for Free Speech (collectively, "Amici").[1] As organizations that defend and advocate for First Amendment rights, Amici respectfully submit this brief in support of Plaintiff-

---

[1] Pursuant to Fed. R. App. P. 29(a)(4), Amici certify that counsel for Amici authored this brief in whole; that no counsel for a party authored this brief in any respect; and that no person or entity, other than amicus and its counsel, contributed monetarily to this brief's preparation or submission.

Appellee to raise critical free speech issues implicated by this case. Amici share concerns over the bad-faith prosecution employed by the District Attorney and will highlight (1) why federal courts should be available to expeditiously halt unjustified prosecutions and vindicate fundamental First Amendment rights and (2) how allowing the prosecution to proceed could chill a diverse range of speech.

**Texas Association of Broadcasters** is a non-profit association that represents more than 1,300 television and radio stations in Texas with a tradition of community-oriented, free, over-the-air broadcasting. The Texas Association of Broadcasters was founded in 1953 and performs numerous services on behalf of its members, including advocating legislation relating to and affecting radio and television broadcasters and defending open government, as well as publishing guidebooks on various legal issues, including access to public information.

**Texas Press Association** ("TPA") is a non-profit industry association representing nearly 400 daily and weekly newspapers in Texas, each of which upholds a strong tradition of journalistic integrity and community service. TPA, founded more than 130 years ago, performs numerous services on behalf of its members, including advocating legislation relating to free speech and press and taking legal action to protect the First Amendment and open government.

**The Texas Tribune** is an all-digital, member-supported nonprofit and nonpartisan news organization that covers state government in Texas. Founded in

2009, the Tribune provides its stories for free to the public and for other news organizations to republish, also for free.

**Freedom of Information Foundation of Texas** is a nonprofit organization that works to encourage a greater appreciation, knowledge and understanding of the First Amendment and helps to ensure that the public's business is conducted in public. Since its formation in 1978, the Foundation has helped citizens access government meetings and documents. The non-partisan Foundation acts as a statewide information clearinghouse and offers guidance and assistance on FOI-related issues through a network of attorneys and through public seminars and conferences.

**The American Booksellers for Free Expression** ("ABFE") is the free speech initiative of the American Booksellers Association ("ABA"). ABA was founded in 1900 and is a national not-for-profit trade organization that works to help independently owned bookstores grow and succeed. ABA represents 2,178 bookstore companies operating in 2,593 locations. ABA's core members are key participants in their communities' local economy and culture. To assist them, ABA provides education, information dissemination, business products, and services; creates relevant programs; and engages in public policy, industry, and local first advocacy.

**The Association of American Publishers, Inc.** ("AAP"), a not-for-profit organization, represents the leading book, journal, and education publishers in the United States on matters of law and policy, advocating for outcomes that incentivize the publication of creative expression, professional content, and learning solutions. AAP's members range from major commercial book and journal publishers to small, non-profit, university, and scholarly presses, as well as leading publishers of educational materials and digital learning platforms. AAP's members publish a substantial portion of the general, educational, and religious books produced in the United States, including critically acclaimed, award-winning literature for adults, young adults, and children. AAP represents an industry whose very existence depends on the free exercise of rights guaranteed by the First Amendment. AAP's board companies are listed at https://publishers.org/who-we-are/our-board/.[2] Its full member roster is listed at https://publishers.org/who-we-are/our-members/.

**The Authors Guild** was founded in 1912, and is a national non-profit association of more than 13,000 professional, published writers of all genres. The Guild counts historians, biographers, academicians, journalists, poets, translators, and other writers of non-fiction and fiction as members. The Guild works to promote the rights and professional interest of authors in various areas, including copyright, fighting censorship, and taxation. Many Guild members earn their

---

[2] All internet citations in this brief were last visited June 7, 2023.

livelihoods through their writing. Their work covers important issues in history, biography, science, politics, medicine, business, and other areas; they are frequent contributors to the most influential and well-respected publications in every field. One of the Authors Guild's primary areas of advocacy is to protect the free expression rights of authors.

**The Cato Institute** was established in 1977 as a nonpartisan public policy research foundation dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies was established in 1989 to promote the principles of limited constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books and studies, conducts conferences, and issues the annual *Cato Supreme Court Review*.

**The Center for Investigative Reporting (d/b/a Reveal)**, founded in 1977, is the nation's oldest nonprofit investigative newsroom. Reveal produces investigative journalism for its website https://www.revealnews.org/, the Reveal national public radio show that airs on 600+ radio stations, and various documentary projects. Reveal often works in collaboration with other newsrooms across the country.

**First Amendment Foundation, Inc.**, is a 501(c)(3) tax-exempt, non-profit organization created to ensure government openness and transparency by providing education and training, monitoring open records and meetings laws, and assisting

citizens and journalists in obtaining access to government information and proceedings. Amicus has a strong interest in this proceeding because it, and the citizens and journalists it supports, all routinely exercise their First Amendment rights by promoting and engaging in speech on matters of public concern that must be free from the chilling fear of prosecution.

**Fox Television Stations, LLC**, a wholly owned subsidiary of Fox Corporation, owns and operates 29 full-power broadcast television stations in the U.S., including stations located in 14 of the top 15 largest markets, and duopolies in the three largest markets (New York, Los Angeles, and Chicago). In addition to distributing sports, entertainment, and syndicated content, our television stations collectively produce approximately 1,200 hours of local news every week.

**Freedom of the Press Foundation** is a non-profit organization dedicated to helping support and defend public-interest journalism. Freedom of the Press Foundation advocates for transparency and accountability in an effort to preserve the rights guaranteed to the press under the First Amendment and strengthen the public's right to know. As part of that mission, the organization has served as amicus curiae in cases addressing First Amendment issues raised by emerging technologies and government surveillance in the federal courts.

**Freedom to Read Foundation** is an organization established by members of the American Library Association to promote and defend First Amendment rights,

foster libraries as institutions that fulfill the promise of the First Amendment, support the rights of libraries to include in their collections and make available to the public any work they may legally acquire, establish legal precedent for the freedom to read of all citizens, protect the public against efforts to suppress or censor speech, and support the right of libraries to collect and individuals to access information that reflects the diverse voices of a community so that every individual can see themselves reflected in the library's materials and resources.

**The Institute for Policy Innovation** ("IPI") is a 501(c)(3) nonprofit public policy research institute founded in 1987 to propose solutions to public policy problems based on the principles of individual liberty, constitutional governance, free markets and limited government. First Amendment speech issues fall within the scope of the public policy issues IPI includes in its issue portfolio.

**International Center for Law & Economics** ("ICLE") is a nonprofit academic research organization that promotes governance rooted in the rule of law and the development of economically grounded policies that promote consumer welfare. ICLE scholars have studied and written extensively on the law and economics of the First Amendment and free expression.

**The Media Coalition Foundation, Inc.** monitors potential threats to free expression, and engages in litigation and education to protect free speech rights, as guaranteed by the First Amendment.

**The Media Institute** is a nonprofit foundation specializing in communications policy issues. The Institute exists to foster three goals: freedom of speech, a competitive media and communications industry, and excellence in journalism. The Media Institute is one of the country's leading organizations focusing on the First Amendment and speech-related issues.

**The Media Law Resource Center** ("MLRC") is a non-profit association which supports media lawyers and media companies in legal matters. It counts as members some 125 media companies, including the largest print, broadcast and digital entities in the United States, as well as over 200 law firms which work in the media law space. The MLRC puts on conferences on media law issues, distributes daily, monthly and quarterly publications, presents webinars on timely legal and journalistic topics, and gets involved in policy initiatives, generally in support of First Amendment rights and free expression.

**Motion Picture Association, Inc.** ("MPA") is a not-for-profit trade association founded in 1922. The MPA serves as the voice and advocate of the film and television industry, advancing the business and art of storytelling, protecting the creative and artistic freedoms of storytellers, and supporting the creative ecosystem that brings entertainment and inspiration to audiences worldwide.

**National Coalition Against Censorship** ("NCAC") is an alliance of 59 national non-profit literary, artistic, religious, educational, professional, labor, and

civil liberties groups that are united in their commitment to freedom of expression. NCAC works to protect the First Amendment rights of artists, authors, students, readers, and the general public. Since its founding, it has had a special interest in supporting artistic expression that is threatened with suppression because of its sexual content. The views presented in this brief are those of NCAC and do not necessarily represent the views of each of its participating organizations.

**National Press Photographers Association** ("NPPA") is a 501(c)(6) not-for-profit organization dedicated to the advancement of visual journalism in its creation, editing, and distribution. NPPA's members include video and still photographers, editors, students, and representatives of businesses that serve the visual journalism community. Since its founding in 1946, the NPPA has been the Voice of Visual Journalists, vigorously promoting the constitutional and intellectual property rights of journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism.

**The News/Media Alliance** represents news and media publishers, including nearly 2,000 diverse news and magazine publishers in the United States—from the largest news publishers and international outlets to hyperlocal news sources, from digital-only and digital-first to print news. Alliance members account for nearly 90% of the daily newspaper's circulation in the United States. Since 2022, the Alliance is also the industry association for magazine media. It represents the interests of close

to 100 magazine media companies with more than 500 individual magazine brands, on topics that include news, culture, sports, lifestyle and virtually every other interest, avocation or pastime enjoyed by Americans. The Alliance diligently advocates for news organizations and magazine publishers on issues that affect them today.

**Penguin Random House LLC** publishes adult and children's fiction and nonfiction in print and digital trade book form in the U.S. The Penguin Random House global family of companies employ more than 10,000 people across almost 250 editorially and creatively independent imprints and publishing houses that collectively publish more than 15,000 new titles annually. Its publishing lists include more than 60 Nobel Prize laureates and hundreds of the world's most widely read authors, among whom are many investigative journalists covering domestic politics, the justice system, business and international affairs.

**The Reporters Committee for Freedom of the Press** is an unincorporated nonprofit association. The Reporters Committee was founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources. Today, its attorneys provide *pro bono* legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.

**The Tully Center for Free Speech** began in Fall, 2006, at Syracuse University's S.I. Newhouse School of Public Communications, one of the nation's premier schools of mass communications.

**INTRODUCTION**

This case is about a good law employed in bad faith to punish constitutionally protected speech. Netflix has faced two misguided prosecutions and five indictments under Tex. Penal Code §§ 43.262[3] and 43.25 for its distribution of *Cuties*, an award-winning film[4] that addresses important societal issues such as the influence of social media and cultural heritage. As shown by extensive delays, a lack of probable cause, dubious motives, and selective use of evidence, the District Attorney prosecuted Netflix in bad faith and deprived it of an immediate remedy in state court. Thus, this is the rare case where it is appropriate for federal courts to fulfill their duty to protect constitutional rights, including those under the First Amendment, and put an end to an unjustified state prosecution.

*Cuties* is a French film that tells the story of an 11-year-old Senegalese immigrant, Amy, torn between her family's conservative culture and the more progressive French society. It explores the challenges of childhood and the pressures of the rapidly rising influence of social media. Amy's experience, which is shared by girls and boys throughout the world, serves as a reminder of the struggles of

---

[3] Soon after being charged under § 43.262, the statute was held unconstitutional. *See Ex parte Lowry*, 639 S.W.3d 151, 169 (Tex. App.—Houston [1st Dist.] 2021, pet. granted).

[4] *Cuties* received the "Directing Award" at the Sundance Film Festival in January 2020 and the "Best First Film" and "Best Female Newcomer" awards at the César Film Festival in France, among others. ROA.1537.

adolescence, especially in modern times, and has sparked many productive conversations among adults and children alike.

Amici acknowledge the critical importance of enforcing child pornography statutes. But rather than foster the goal of protecting minors from harm, the continued criminal prosecution of Netflix would result not only in censorship of significant issues of public concern about children and uncomfortable truths that are discussed in the film, but also broader chilling effects on protected speech. Without the ability to seek redress for baseless prosecutions in federal court, critical constitutional rights would be curbed, and a vast array of speech would be chilled for fear of being similarly prosecuted. This Court should thus affirm the District Court's well-reasoned decision vindicating Netflix's First Amendment rights and, by extension, those of others who wish to speak on controversial topics of public interest.

## SUMMARY OF ARGUMENT

The bad-faith use of §§ 43.262 and 43.25 to prosecute Netflix to censor protected speech violates established constitutional law and should be foreclosed. Amici, as representatives of news outlets, publishers, reporters, photographers, authors, movie studios, advocacy groups, and public policy organizations, are uniquely positioned to advise the Court about the broad First Amendment implications of this case. Amici raise two points for the Court's consideration:

(1) the importance of timely addressing bad-faith prosecutions and vindicating First Amendment rights in federal court; and (2) the unconstitutional chilling effects of such criminal prosecutions on all speakers.

First, the District Court appropriately enjoined the prosecution of Netflix over its distribution of an award-winning film in light of the record of bad faith and efforts to strip Netflix of a timely remedy in state court. The District Attorney, who could not remember whether he saw the entire film,[5] first obtained charges under § 43.262 by intentionally showing the grand jury curated snippets and still images of *Cuties* he deemed to be the most provocative,[6] even though all three elements of the alleged crime were absent—the film did *not* depict "lewd exhibition" of visual material, the film *had* serious literary, artistic, political, or scientific value,[7] and the film did *not* appeal to the prurient interest in sex. Then, more than 500 days later, after § 43.262 was declared unconstitutional,[8] the District Attorney changed course and prosecuted Netflix for exercising its right to petition by bringing four new charges under § 43.25,[9] a harsher child pornography law that he had never used against a

---

[5] ROA.1200.

[6] Appellee Br. at 11-12.

[7] Tex. Penal Code § 43.262(b)(2)-(3); *Ex parte Lowry*, 639 S.W.3d at 168.

[8] *Ex parte Lowry*, 639 S.W.3d at 168.

[9] Appellee Br. at 10-11.

corporation,[10] and for matters to which he knew the statute did not apply.[11] These strategic maneuvers deprived Netflix of the opportunity to address its constitutional concerns through habeas proceedings.

Confronted with repeated unfounded prosecutions and no state court remedy, Netflix sought relief in federal court, the "final arbiter" of the U.S. Constitution.[12] This type of access to federal courts must be available to Netflix and other defendants, like Amici, who may face unfounded prosecutions and infringements of fundamental First Amendment rights.

Second, allowing the prosecution of Netflix to continue could unleash a flood of chilling effects on a broad spectrum of protected speech. If not enjoined, the prosecution could spur similarly abusive and harassing prosecutions against a wide range of speech under other statutes based on the personal tastes of government officials. Even the threat of such prosecutions would have a chilling effect on others who fear similar actions targeting disfavored speech. This flies in the face of our nation's history and U.S. Supreme Court jurisprudence.[13] Allowing such

---

[10] Appellee Br. at 10.

[11] For instance, one of the indictments was brought based on "Jane Doe," even though the District Attorney was informed that she was an adult and there was no evidence to the contrary. *See id*. at 12.

[12] *New York v. Ferber*, 458 U.S. 747, 767 (1982).

[13] *See Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the

unprecedented prosecutions to proceed would provide ambitious government officials with a heckler's veto over protected speech, depriving the public of discussions of critical issues, such as those addressed in the film. Worse, allowing the continued prosecution of Netflix could chill the creation and dissemination of works involving children and related sensitive topics, issues that are frequently the subject of the most influential photography, journalism, memoirs, advocacy, and public policy debates. A reversal of the District Court's decision would not only cause self-censorship; it would also interfere with the fundamental right to receive valuable information.

## ARGUMENT

I. **Federal courts must be available to vindicate fundamental First Amendment rights in the face of unconstitutional bad-faith criminal prosecutions that deprive defendants of immediate state court remedies.**

A. **The repeated prosecutions, delay tactics, and unsubstantiated charges against Netflix display a pattern of bad faith.**

1. **Netflix initially faced charges under Texas Penal Code § 43.262 despite extensive exculpatory evidence.**

The history of this case, such as the repeated delay tactics, lack of probable cause, and deprivation of procedural safeguards, is critical to understanding the baseless nature of the prosecutions against Netflix and why the District Court

---

expression of an idea simply because society finds the idea itself offensive or disagreeable.").

correctly held that the bad-faith exception to *Younger v. Harris*, 401 U.S. 37 (1971),

applies. The background facts also underscore Amici's concerns that their protected

speech—and that of many other speakers—could be similarly targeted and

suppressed.

Nearly a month after the release of *Cuties*, a grand jury indicted Netflix under

Texas Penal Code § 43.262,[14] for the "lewd exhibition of the genitals or pubic area

of a clothed or partially clothed child who was younger than 18 years of age at the

time the visual material was created." ROA.1075-1079. ("First Indictment"). As

shown by the presentment of the case to the grand jury, there was no probable cause

to charge Netflix under § 43.262—and certainly no evidence beyond a reasonable

doubt—because the three elements[15] required by the statute were missing. The

District Attorney showed the grand jury cherry-picked video excerpts and still

images from *Cuties*[16] to purposefully highlight what he deemed to be the film's most

provocative scenes,[17] which did not contain the type of sexual content required by

[14] Section 43.262, a low-level felony, was enacted to broaden the criminalization of "visual materials" to include materials that were considered "child erotica" but not "child pornography." *See* Appellee Br. at 4.

[15] *See id.* at 4-5.

[16] *See id.* at 6.

[17] When asked at his deposition whether he showed the grand jury "the most provocative scenes" and still images from the film "as opposed to showing the film in the manner in which Netflix streams [the] film," the District Attorney responded "Yes, that is correct." ROA.1205. For example, the District Attorney showed the grand jury six seconds of a scene that he characterized as depicting "a wet girl performing in panties" when, in fact, the three-and-a-half-minute scene featured a

the statute.[18] The District Attorney also ignored that *Cuties* has serious, literary, artistic, political, or scientific value, as conceded by the State in a related case,[19] dooming any claim under § 43.262(b)(3).[20]

Instead, the prosecution's motives were evident from the jump. According to the District Attorney's press release, he believed that *Cuties*, despite the important conversations it had sparked about childhood adversity, cultural differences, and the pressures of social media, had "destructive consequences."[21] He admitted that he wanted to stop the distribution of *Cuties* based on his personal views, not those of his constituents.[22] And even though the District Attorney claimed to have watched

---

religious ritual—not a sexual performance—where Amy, who was fully clothed, is sprinkled with water by her family to cleanse her in an effort to correct her bad behavior. *See* Appellee Br. at 7.

[18] *See Jenkins v. Georgia*, 418 U.S. 153, 161 (1974); § 43.262(b)(1)-(2).

[19] *Ex parte Lowry*, 639 S.W.3d at 168 ("During the writ hearing, the State acknowledged the charges against Netflix, expressed that it could not explain another county's decision to prosecute, and believed Netflix's movie had political, literary, and artistic value.").

[20] Instead of telling the grand jury *Cuties* had won directing and performance awards and received accolades from critics and the public, *see* fn. 4, *supra*, the District Attorney omitted exculpatory scenes showing that *Cuties* has serious literary, artistic, political, or scientific value. *See* Appellee Br. at 44.

[21] ROA.43.

[22] The District Attorney stated in the press release, "After hearing about the movie *Cuties* and watching it, I knew there was probable cause to believe it was criminal under Section 43.262 of the Texas Penal Code." ROA.43. The District Attorney testified that there were no complaining witnesses and that he only spoke with First Assistant District Attorney Pat Hardy before bringing charges against Netflix. *See* Appellee Br. at 5.

*Cuties*,[23] when asked under oath, he later conceded he could not remember if he saw the entire film.[24]

Ultimately, nothing came of the § 43.262 prosecution. After the case stalled for more than a year,[25] the First Court of Appeals struck down § 43.262 as unconstitutional in an unrelated case,[26] and Netflix filed a Habeas Petition on November 15, 2021, to invalidate § 43.262 under the First and Fifth Amendments.[27] In response to the Habeas Petition, the District Attorney dismissed the First Indictment—but that was not the end of the story.

> **2.    After months of delays, Netflix faced a second set of charges under Texas Penal Code § 43.25, a more serious law, in response to its petitioning activity.**

The timing and nature of Netflix's new prosecution on four separate charges under § 43.25,[28] a more serious child pornography statute[29] ("New Indictments"), exhibits further bad faith. First, the prosecutors sought the New Indictments only

---

[23] Appellee Br. at 5.

[24] ROA.1200.

[25] Appellee Br. at 9.

[26] *Ex Parte Lowry*, 639 S.W.3d at 169.

[27] ROA.47-92. Although Netflix asked for a hearing on the Habeas Petition in November 2021, it did not receive one until four months later after the District Attorney sought to delay the hearing until March 2022. ROA.1545-1546.

[28] The District Attorney admitted that he could have brought one indictment instead of four. *See* Appellee Br. at 11. Because there are four charges, Netflix could face four separate jury trials.

[29] *See Netflix, Inc. v. Babin*, No. 9:22-CV-00031, 2022 WL 16948603, at *10-11 (E.D. Tex. Nov. 14, 2022).

after Netflix filed a Habeas Petition and conceded that § 43.25 was facially constitutional, which foreclosed Netflix from seeking habeas relief from the new charges or an immediate appeal.[30] Second, the District Attorney brought one of the indictments based on "Jane Doe," a woman whose breast was shown for a fraction of a second in Cuties, even though he was informed she was an adult and had no evidence to the contrary.[31] Third, charges were brought over clothed performances that do not meet the definition of "sexual conduct"[32] under § 43.25.[33]

Because of the District Attorney's bad-faith motives, lack of credible evidence, and manipulation of the court system, as outlined above, Netflix was barred from challenging the New Indictments through pretrial habeas relief in state court. Thus, Netflix chose to vindicate its constitutional rights in federal court, a proper venue in light of the crucial constitutional questions at issue.

---

[30] Appellee Br. at 11.

[31] *See id.* at 18; *Netflix*, 2022 WL 16948603, at **10, 14 ("Mr. Babin received notice—well before he sought the New Indictments—that Jane Doe was over eighteen at the time of filming;" "[T]here is conclusive evidence in the record that Jane Doe was over eighteen at the time of filming.").

[32] "Sexual conduct" includes "sexual contact, actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, sado-masochistic abuse, or *lewd exhibition* of the genitals, the anus, or any portion of the female breast below the top of the areola." § 43.25(a)(2) (emphasis added).

[33] *See* Appellee Br. at 10. The District Court did not believe *Cuties* contained "child pornography." *Netflix*, 2022 WL 16948603, at *11 ("Section 43.25 is a child pornography statute, but the Court is unconvinced that *Cuties* contains child pornography.").

**B.     Federal courts play a critical role in safeguarding First Amendment rights from abuse by state actors.**

Access to federal courts is vital in cases, such as this one, where there is a demonstrated pattern of bad faith and First Amendment rights are at stake. Federal courts have an important role to play under Article III of the U.S. Constitution and federal law as places of refuge when state courts cannot adequately remedy constitutional harms, like here. Federal courts, which "have original jurisdiction of all civil actions arising under the Constitution"[34] are tasked with being "the final arbiter of whether the Federal Constitution necessitated the invalidation of a state law." *Ferber*, 458 U.S. at 767. "The federal courts are not permitted . . . to shut their doors to a complaint of federal constitutional violation even if there is a possible state remedy which is being pursued." *Daniel v. Waters*, 515 F.2d 485, 488 (6th Cir. 1975). Under this mandate, the District Court appropriately stepped in and enjoined the District Attorney's unconstitutional prosecution of Netflix.

Although Amici understand that enjoining a state criminal prosecution is typically barred by *Younger v. Harris*, 401 U.S. 37 (1971), this is the rare case where an exception to *Younger* applies. Federal intervention is appropriate here, where fundamental First Amendment interests are at stake and the record shows that the District Attorney brought the New Indictments in bad faith in response to Netflix's

---

[34] 28 U.S.C. § 1331.

petitioning activity. The U.S. Supreme Court has recognized that "vindication of freedom of expression" should not "await the outcome of protracted litigation." *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965).

In *Dombrowski*, the Court struck down an anti-communist law under the First Amendment and instructed the lower court to enjoin a state criminal prosecution of a civil rights leader. *Id*. at 497. The Court held that a defendant should not face the burdens of a state prosecution when, like here, important First Amendment interests are at play. *Id*. at 486. "Because of the sensitive nature of constitutionally protected expression, we have not required that all of those subject to overbroad regulations risk prosecution to test their rights. For free expression—of transcendent value to all society, and not merely to those exercising their rights—might be the loser." *Id*. Like the anti-communist law at issue in *Dombrowski*, errant prosecutions under §§ 43.262 and 43.25 "lend themselves too readily to denial of [First Amendment] rights." *Id*.; *see also Mills v. Alabama*, 384 U.S. 214, 221 (1966) (when "First Amendment rights are jeopardized by a state prosecution which, by its very nature, threatens to deter others from exercising their First Amendment rights," federal courts should "take the extraordinary step of enjoining the state prosecution").

## C.    The circumstances of this case demand federal court review.

The circumstances of this case demand that Netflix be afforded an opportunity to address its constitutional concerns in federal court instead of state court, where

22

Netflix has been prevented from timely vindicating its rights. Netflix already attempted to use the Texas state court system to protect itself from the District Attorney's initial prosecution under § 43.262 by filing a Habeas Petition on November 15, 2021. *See* ROA.1084-1128. But instead of addressing the Habeas Petition "without delay," as required under Tex. Code Crim. P. 11.15, the District Attorney stalled for a year[35] and ultimately denied Netflix the opportunity to contest the constitutionality of the prosecution in state court by bringing new charges under § 43.25 once Netflix could no longer seek habeas relief.

Denied the ability to sufficiently defend its First Amendment rights in state court during the first prosecution, Netflix understandably turned to the District Court to obtain timely relief instead of, again, enduring years of litigation in state court. The need for Netflix to resort to federal court for vindication of its First Amendment rights is sharpened by the fact that interlocutory appeals are typically not allowed in Texas state court. *See State v. Morgan*, 160 S.W.3d 1, 4-5 (Tex. Crim. App. 2004) ("As a general rule, interlocutory appeals are not permitted."); *Gutierrez v. State*, 307 S.W.3d 318, 323 (Tex. Crim. App. 2010) ("[I]nterlocutory appeals are viewed as an extraordinary measure and are rarely permitted."). And even if a dispositive motion is granted, Netflix's speech would remain unconstitutionally chilled while it trudged through the extensive process of seeking mandamus relief in state court.

---

[35] *See* Appellee Br. at 9.

*See Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966) ("The threat of being put to the defense of a lawsuit brought by a popular public official may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself."). And after all of that, the case could potentially end up in federal court anyway, where it belongs. *See Cooper v. Aaron*, 358 U.S. 1, 18 (1958) (a "permanent and indispensable feature of our constitutional system" is that "the federal judiciary is supreme in the exposition of the law of the Constitution"). Instead, given that Netflix's past efforts to work within the Texas court system were frustrated by a prosecutor acting in bad faith, this Court should end the prolonged process and affirm the District Court's order.

## II. The criminal prosecution of Netflix unconstitutionally chills the dissemination and receipt of a broad spectrum of First Amendment protected speech.

### A. Permitting a criminal prosecution of Netflix under these circumstances would encourage bad-faith prosecutions of protected speech.

The impact of this Court allowing the prosecution of Netflix to proceed could be wide-reaching and encourage similar bad-faith prosecutions of constitutionally protected speech under other criminal statutes. Judging the artistic merits of works should not be left to the whims of government officials. After all, "one man's vulgarity is another's lyric." *Cohen v. California*, 403 U.S. 15, 25 (1971). "[B]ecause governmental officials cannot make principled distinctions" on what should be

allowed in public debate, "the Constitution leaves matters of taste and style so largely to the individual." *Id*. Although a government official may personally disagree with the message promoted in an expressive work, this country has decided, as guided by its history and U.S. Supreme Court precedent, that the government— much less *one* government official—should not dictate what is allowed in the marketplace of ideas. *See Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").

Such mighty power vested in the government to control speech harkens back to dark days in our nation's history when the government required a license to publicly disseminate information and many forms of entertainment did not receive constitutional protection. *See Mutual Film Corp. v. Indus. Comm'n of Ohio*, 236 U.S. 230, 244 (1915) (holding unanimously that motion pictures were not protected by the First Amendment and that states and local governments had the right to grant or withhold licenses to exhibit films). Those days are long gone, as evidenced by the absence of censorship boards, the rarity of criminal prosecutions of distributors of expressive content, and the judicial recognition of entertainment as protected speech. *See Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503 (1952) (overruling *Mutual Film*, recognizing that films are protected by the First Amendment, and striking

down New York's movie-licensing regime as an impermissible prior restraint on speech).

To allow one government official to prescribe the social norms of an entire country would provide what the U.S. Supreme Court has described as an unconstitutional heckler's veto, which it warned against in *Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 590 (2002) ("To read the statute as adopting the community standards of every locality in the United States would provide the most puritan of communities with a heckler's Internet veto affecting the rest of the Nation."). Such an outcome would deprive society of thought-provoking discussions about important public issues, such as the issues in the film—the impact of social media on the youth in our society and how different cultures are dealing with this phenomenon. It would also undoubtedly stymie the creation, production, and distribution of other forms of content seeking to elevate discussions about other difficult topics and uncomfortable truths.

    **B.**     **The District Attorney's prosecution unconstitutionally chills Netflix's speech and that of countless other speakers.**

        **1.**     **The District Attorney's prosecution unconstitutionally chills Netflix's speech.**

The District Attorney claims that Netflix fails to show that charges were brought to "chill" Netflix's speech, in part, because Netflix "has not changed the

content of the movie in response to either suit."[36] But this argument fails for at least two reasons.

First, a plaintiff does not need to cease its speech activities to show that it will suffer irreparable injury if an injunction is not granted. *See McLin v. Ard*, 866 F.3d 682, 696-97 (5th Cir. 2017). A plaintiff need show only that it suffered an injury that "would chill a person of ordinary firmness from continuing to engage in that activity." *Id*. at 696. A "small" effect on freedom of speech is enough because "there is no justification for harassing people for exercising their constitutional rights." *Id*. at 697. As explained below in Section II.B.2, the criminal prosecution of Netflix would cause chilling effects across an entire spectrum of speakers Amici represent, such as journalists, writers, photographers, filmmakers, and more.

Second, as the District Court found, a bad-faith prosecution, as a matter of law, will "'cause irreparable injury regardless of its outcome.'" *Netflix*, 2022 WL 16948603, at *15 (quoting *Wilson v. Thompson*, 593 F.2d 1375, 1383 (5th Cir. 1979)). In *Wilson*, the Fifth Circuit found that a "state proceeding *itself*," such as the one against Netflix, can "create[] a chilling effect on speech." 593 F.2d at 1383; *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable

---

[36] Appellant Br. at 36-37.

injury."); *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295 (5th Cir. 2012).

> ### 2.    The District Attorney's prosecution unconstitutionally chills a broad spectrum of protected speech.

If the criminal prosecution of Netflix proceeds, chilling effects would be felt by a variety of organizations and individuals that engage in protected speech, such as Amici. Amici, who include journalists, authors, photographers, investigative reporters, news outlets, movie studios, publishers, advocacy groups, and public policy organizations that regularly exercise their First Amendment rights, have grave concerns about the prosecution of societally valuable speech, such as *Cuties*. The prosecution of Netflix under §§ 43.262 and 43.25 raises line-drawing problems because many of the most impactful and valuable informative works involve children and other related sensitive topics. If *Cuties* may be subject to prosecution as "child pornography" for showing clothed young girls dancing, what other works could be similarly subject to bad-faith prosecutions using similar laws?

For instance, the most defining photograph from the Vietnam War, "The Terror of War,"[37] features a nine-year-old child running on a road naked after being burned by a napalm attack. The Pulitzer Prize-winning photograph perfectly captures the trauma and violence of the deadly conflict, in part, *because* the

---

[37] *See* Nick Ut, *The Terror of War* (photograph), National Gallery of Art, June 8, 1972.

unclothed child emphasizes the drastic toll the war had on children in Vietnam and how it stripped them of their basic needs.[38]

This iconic photograph does not stand alone. Photography is consistently used to bring real-world issues and challenges to life. For example, in 2020, *The Washington Post* published a moving photo essay from Spanish photographer David Arribas about a young child who was diagnosed with anorexia at the age of 14.[39] Two of the many vivid photographs included in the essay are shown below. Visual images are naturally used in documentaries, films, news articles, and other forms of public advocacy to highlight the physical toll eating disorders cause to children's bodies.



---

[38] *See* Nick Ut, *"The Terror of War": 50 Years Later*, THE PULITZER PRIZES, June 6, 2022.

[39] *See* Kenneth Dickerman, *'I know that there will probably always be an anorexic part inside of me, but there is also one that fights for life, and won't tire of doing so'*, THE WASHINGTON POST, Feb. 24, 2020.



A review of the Pulitzer Prize winners from 2023 shows that the best journalism frequently involves stories of struggles faced by children. An account of migrant children separated at the border won the 2023 Pulitzer Prize in Explanatory Reporting.[40] An article about a Texas teenager who gave birth to twins received the 2023 Pulitzer Prize in National Reporting.[41] A podcast about the abuse of hundreds of Indigenous children at an Indian residential school in Canada captured the 2023 Pulitzer Prize in Audio Reporting.[42] Future reporting on these vital public issues should not be limited by the threat of criminal prosecution.

---

[40] *See* Caitlin Dickerson, *We need to take away children*, THE ATLANTIC, Aug. 7, 2022.

[41] *See* Caroline Kitchener, *This Texas teen wanted an abortion. She now has twins*, THE WASHINGTON POST, June 20, 2022.

[42] *See* Connie Walker, *Stolen: Surviving St. Michael's*, GIMLET MEDIA, May 17, 2022.

Sensitive childhood topics are also shared through memoirs, which often become documentaries, movies, and other visual works. For example, Stephanie Foo recently released a memoir, *What My Bones Know*, about her childhood consumed with abandonment by her parents and years of physical and verbal abuse and neglect.[43] A review of recently released memoirs reveals the abundance of books tackling tough childhood topics. For instance, former actress Jennette McCurdy wrote about her struggles with eating disorders and addiction as a child star in a 2022 memoir; actor Billy Porter described being forced into behavioral therapy and the constant bullying he confronted during childhood in a 2021 memoir; and singer Jessica Simpson shared the sexualization she faced as a child in the public eye in a 2020 memoir.[44] None of these authors may have been comfortable chronicling their childhoods if there were threats of potential prosecution. These are just a small sampling of the thousands of similar memoirs, audio books, and podcasts released over the past few decades about childhood experiences. Chilling the production of childhood memoirs would be harmful to authors, who find therapy and healing in writing and sharing their stories, to readers, who find comfort in hearing similar childhood struggles and realizing their experiences are not unique, and to the public

---

[43] *See* Stephanie Foo, *What My Bones Know*, Feb. 21, 2023.

[44] *See* Megan Beauregard, *7 Memoirs from Stars Who Overcame Childhood Hardships*, BOOKTRIB, Oct. 27, 2022.

at large whose awareness is raised about these difficult societal issues so that they

can be better addressed in the future.

If the prosecution of Netflix is allowed to proceed, it could cause Amici and

other speakers to reconsider how they portray and discuss a wide swath of sensitive

topics that the public would benefit from discussing. *See United States v. Alvarez*,

567 U.S. 709, 728 (2012) ("Society has the right and civic duty to engage in open,

dynamic, rational discourse. These ends are not well served when the government

seeks to orchestrate public discussion through [criminal prosecutions]."). For

example, a news outlet may curb its coverage of reports of child sex trafficking,[45]

the treatment of children at the border,[46] and statutory rape[47] because they involve

minors, hindering awareness of grave societal problems. An advocacy organization

may hesitate to shine a light on issues like child sex trafficking and exploitation of

minors for fear that their message or visual materials may cross an ill-defined line.[48]

*See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 349 (2010) ("If the First

---

[45] *See* Morgan Smith, Neena Satija, & Edgar Walters, *SOLD OUT: How the crusade against sex trafficking in Texas has left child victims behind*, THE TEXAS TRIBUNE, Feb. 13, 2017.

[46] *See* Stephen Simpson, *For migrant children who cross the border alone, a new set of challenges getting health care awaits*, THE TEXAS TRIBUNE, Apr. 26, 2023.

[47] *See* Betsy Reed, *Alanis Morissette says she was victim of multiple statutory rapes as a teenager*, THE GUARDIAN, Sept. 13, 2021.

[48] *See Students, parents protest sex trafficking, call for safer streets in South Los Angeles*, CBSNews.com, Jan. 6, 2023.

Amendment has any force, it prohibits Congress from fining or jailing citizens, or associations of citizens, for simply engaging in political speech."). Studios may decide not to create documentaries like the recent Hulu production, *Pretty Baby: Brooke Shields*, exploring the objectification of child stars.[49] These types of works exploring the issues facing children—the very issues that need to be discussed to help facilitate an end to child exploitation—could be silenced if the prosecution of Netflix proceeds.

Besides affecting distributors, the pursuit of charges against Netflix chills individuals from start to finish of the creative process. *See Alvarez*, 567 U.S. at 733 (criminal prosecutions are "particularly dangerous" because they "can more easily result in censorship of speakers and their ideas"). Using the movie industry as an example, the prosecution of Netflix would not only cause platforms that disseminate content to self-censor, but it would also chill the writers who develop the scripts, producers who make the films, editors who decide what makes the final cut, and the actors and actresses who tell the stories.

For instance, writers may stay clear of storylines involving children, even if they are valuable, to avoid a potential prosecution. Producers might hesitate to use a

---

[49] *Pretty Baby: Brooke Shields* shines a light on the hyper-sexualization of Hollywood and the difficulties of being a child star. *See* Daniel Fienberg, *'Pretty Baby: Brooke Shields' Review: A Timely Doc About Hollywood, Hyper-Sexualization and a Star's Resilience*, THE HOLLYWOOD REPORTER, Mar. 31, 2023.

minor—or even an adult that looks young—in a film for fear of prosecution under §§ 43.262 and 43.25 or similar laws. Child actresses like Fathia Youssouf (Amy), Esther Gohourou (Coumba), Ilanah Cami-Goursolas (Jess)—the three stars of *Cuties* included in the New Indictments—may be afraid to audition for or accept certain roles out of fear the films may be the subject of spurious prosecution under child pornography laws. And distributors might refuse to release films that include children to avoid the possibility of criminal prosecution.

If the prosecution of Netflix continues, Amici could pause projects not only in Texas but across the country because of the threat of similar prosecutions. *See Dombrowski*, 380 U.S. at 486 ("The chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure"). Many Amici and those they represent, including non-profit organizations, journalists, photographers, authors, publishers, advocacy groups, and community newspapers, could not withstand the substantial financial impact of a criminal prosecution. Such a prosecution will not only lead to the silencing of many voices but also potentially to the shutting down of entire organizations.[50] At the very least, allowing the prosecution of Netflix could be factored into future business decisions.

---

[50] The Netflix prosecution has been ongoing since September 23, 2020. Few, if any, non-profits, individuals, or community newspapers, for example, could withstand the financial burden of such a lengthy court battle.

**C.   The prosecution of Netflix infringes the public's right to receive information.**

The prosecution of Netflix is a one-two punch against the First Amendment. It not only impacts the creation, production, and distribution of speech, but it also affects the "fundamental right" to receive valuable information, ideas, and expression. *See Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 308 (1965) ("[T]he right to receive publications is such a fundamental right."); *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) (the First Amendment "embraces the right to distribute literature, and necessarily protects the right to receive it") (internal citation omitted).

By infringing the rights of Netflix and Amici to create and distribute protected speech, the prosecution of Netflix simultaneously suppresses the receipt of information. In an analogous case, the U.S. Supreme Court explained that when a distributor of expressive works, like Netflix, faces the threat of criminal prosecution for distributing potentially illegal materials, it will engage in "self-censorship" by restricting the materials sold, which ultimately limits "the public's access to reading matter." *See Smith v. People of the State of California*, 361 U.S. 147, 152-53 (1959). By reducing access to public information, a vast array of viewpoints will be silenced, and informed discussions will be thwarted. Indeed, "[t]he dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and

consider them. It would be a barren marketplace of ideas that had only sellers and no buyers." *Lamont*, 381 U.S. at 308.

## CONCLUSION

This case is vitally important to preserving First Amendment rights when facing a bad-faith prosecution. By permitting repeated prosecutions of Netflix under §§ 43.262 and 43.25, societally valuable and protected speech will be erased from the public sphere, which cuts to the core of the U.S. Constitution. *See Near v. State of Minnesota ex rel. Olson*, 283 U.S. 697, 707 (1931) (the First Amendment has meant "immunity from . . . censorship"). Because the First Amendment has "contributed greatly to the development and well-being of our free society and [is] indispensable to its continued growth," the "door barring [government] intrusion into [the First Amendment] cannot be left ajar; it must be kept tightly closed and opened only the slightest crack necessary to prevent encroachment upon more important interests." *Smith*, 361 U.S. at 155. In this case, the prosecution of Netflix pushes the door wide open. It must be closed by this Court.

Thus, for the foregoing reasons, Amici respectfully request that the Court affirm the District Court's preliminary injunction.

Dated: June 7, 2023                    Respectfully submitted,

                                       */s/ Laura Lee Prather*
                                       Laura Lee Prather
                                       State Bar No. 16234200
                                       laura.prather@haynesboone.com
                                       Michael J. Lambert
                                       State Bar No. 24128020
                                       michael.lambert@haynesboone.com
                                       HAYNES AND BOONE, LLP
                                       600 Congress Avenue, Suite 1300
                                       Austin, Texas 78701
                                       Telephone: (512) 867-8400
                                       Facsimile: (512) 867-8470

                                       ***Attorneys for Amici Curiae***

# <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that:

This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and Fed. R. App. P. 32(a)(7) because it contains **4,823** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fifth Circuit Rule 32.2, which is less than 50 percent of that allotted for the Appellant's brief.

This brief complies with the typeface requirements of Fed. R. App. P.32(a)(5) and Fifth Circuit Rule 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font for text and footnotes.

*/s/ Laura Lee Prather*
Laura Lee Prather

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 7th day of June, 2023, a copy of the foregoing has been served on counsel for all parties to this proceeding through the court's electronic filing system as identified below:

| **Attorneys for Plaintiff-Appellee:** | **Attorneys for Defendant-Appellant Lucas Babin:** |
|---|---|
| Joshua J. Bennett<br>jbennett@carterarnett.com<br>Carter Arnett, P.L.L.C.<br>8150 N. Central Expressway, Suite 500<br>Dallas, Texas 75206 | Kathryn M. Cherry<br>kathryn.cherry@oag.texas.gov<br>Assistant Solicitor General<br>Office of the Attorney General,<br>Solicitor General Division<br>P.O. Box 12548 (MC-059)<br>Austin, Texas 78711-2548 |
| David M. Prichard<br>dprichard@prichardyoungllp.com<br>Prichard Young, L.L.P.<br>10101 Reunion Place, Suite 600<br>San Antonio, Texas 78216 | Christopher Lee Lindsey<br>christopher.lindsey@oag.texas.gov<br>Assistant Attorney General<br>Office of the Attorney General<br>P.O. Box 12548 (MC 059)<br>Austin, Texas 78711-2548 |
| | Jonathan F. Mitchell<br>jonathan@mitchell.law<br>111 Congress Avenue, Suite 400<br>Austin, Texas 78701 |

*/s/ Laura Lee Prather*
Laura Lee Prather