Case No. 22-40786

IN THE UNITED STATES COURT
OF APPEALS FOR THE FIFTH CIRCUIT

NETFLIX, INC.,

*Plaintiff-Appellee*

v.

LUCAS BABIN,

*Defendant-Appellant*

On Appeal from the United States District Court for the Eastern District of Texas,
Lufkin Division, No. 9:22-CV-31
Honorable Michael J. Truncale, U.S. District Judge

**BRIEF OF *AMICI CURIAE* FIRST AMENDMENT SCHOLARS AND
CLINICS IN SUPPORT OF APPELLEE AND AFFIRMANCE**

Thomas S. Leatherbury
THOMAS S. LEATHERBURY LAW, PLLC
Cumberland School Hill Building
1901 N. Akard St.
Dallas, TX 75201
(214) 213–5004
tom@tsleatherburylaw.com

Peter Steffensen
SMU DEDMAN SCHOOL OF LAW
FIRST AMENDMENT CLINIC
P.O. Box 750116
Dallas, TX 75275
(214) 768–4077
psteffensen@smu.edu

Michael L. Charlson
Robert H. Wu
VINSON & ELKINS LLP
555 Mission Street, Suite 2000
San Francisco, CA 94105
(415) 979–6934
mcharlson@velaw.com
bwu@velaw.com

*Attorneys for Amici Curiae First Amendment Scholars and Clinics*

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

1.    No. 22-40786, *Netflix Inc. v. Lucas Babin*.

2.    The undersigned counsel of record certifies that—in addition to the persons and entities listed in Appellee's Certificate of Interested Persons—the following listed persons or entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case.  These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

***Amici Curiae***
Cortelyou Kenney
Gregg Leslie
Stanton Foundation First Amendment Clinic at Vanderbilt Law School
Southern Methodist University Dedman School of Law First Amendment Clinic

***Attorneys for Amici Curiae***
Thomas S. Leatherbury
THOMAS S. LEATHERBURY LAW, PLLC
Michael L. Charlson
Robert H. Wu
VINSON & ELKINS LLP
Peter Steffensen
SMU DEDMAN SCHOOL OF LAW FIRST AMENDMENT CLINIC

No publicly traded company has an ownership interest of 10% in any of the *amicus* entities listed above.

Respectfully submitted,

*/s/ Thomas S. Leatherbury*
*Attorney of Record for Amici Curiae*
*First Amendment Scholars and Clinics*

1

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................2

TABLE OF AUTHORITIES ..........................................................3

STATEMENT OF AMICI CURIAE ...............................................7

INTRODUCTION AND SUMMARY OF ARGUMENT .......................8

   I.   *Younger*'s Core Principles Support Conferring Federal
       Jurisdiction. ........................................................................9

       A.   Comity: The State Has No Proper Interest in Pursuing a
           Prosecution Brought in Bad Faith or for Purposes of
           Harassment.....................................................................11

       B.   Equitable Restraint: Netflix Cannot Adequately Raise Its
           Federal Claims in the State's Courts........................17

   II.   Abstaining Would Profoundly Injure Distributors' First
       Amendment Rights............................................................21

       A.   Abstention Would Undermine First Amendment
           Protections for the Creation and Distribution of Motion
           Pictures...........................................................................22

       B.   This Court Should Confirm the Use of An Objective Test
           to Evaluate First Amendment Retaliation Claims ...................25

CONCLUSION................................................................................32

APPENDIX.....................................................................................34

CERTIFICATE OF SERVICE .......................................................36

CERTIFICATE OF COMPLIANCE................................................37

# TABLE OF AUTHORITIES

## Cases

*Air Evac EMS, Inc. v. McVey*,
   37 F.4th 89 (4th Cir. 2022) ................................................................. 18

*Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*,
   894 F.3d 692 (5th Cir. 2018) .............................................................. 10

*Bantam Books, Inc. v. Sullivan*,
   372 U.S. 58 (1963) ............................................................................ 23

*Barton v. Clancy*,
   632 F.3d 9 (1st Cir. 2011) .................................................................. 26

*Bennett v. Hendrix*,
   423 F.3d 1247 (11th Cir. 2005) ............................................ 27, 29, 31

*Bice v. La. Pub. Def. Bd.*,
   677 F.3d 712 (5th Cir. 2012) ................................... 9, 14, 17, 20

*Capp v. Cty. of San Diego*,
   940 F.3d 1046 (9th Cir. 2019) ........................................................... 27

*Charleston v. Pate*,
   194 S.W.3d 89 (Tex. App.—Texarkana 2006, *no pet.*) ..................... 19

*Colson v. Grohman*,
   174 F.3d 498 (5th Cir. 1999) ............................................................. 30

*Constantine v. Rectors & Visitors of George Mason Univ.*,
   411 F.3d 474 (4th Cir. 2005) ...................................................... 27, 30

*Crawford-El v. Britton*,
   523 U.S. 574 (1998) .......................................................................... 31

*Daves v. Dallas Cty., Tex.*,
   No. 18-11368, 2023 WL 2720444 (5th Cir. Mar. 31, 2023) ......... 18, 19, 20

*Dombrowski v. Pfister*,
   380 U.S. 479 (1965) ............................................................. 13, 15, 16

*Dominguez v. Kernan*,
   906 F.3d 1127 (9th Cir. 2018) ........................................................... 18

*Elrod v. Burns*,
   427 U.S. 347 (1976) .......................................................................... 13

*Estate of Morris v. Dapolito*,
   297 F. Supp. 2d 680 (S.D.N.Y. 2004) ....................................................29

*Ex parte Bishai*, No. 09-21-00158-CR, 2021 WL 5498211
   (Tex. App.—Beaumont Nov. 24, 2021), *pet. for discretionary review granted*
   (Feb. 9, 2022), *pet. for discretionary review dismissed*, No. PD-0935-21,
   2022 WL 698178 (Tex. Crim. App. Mar. 9, 2022) ...............................19

*Freedman v. State of Md.*,
   380 U.S. 51 (1965) .................................................................................24

*Garcia v. City of Trenton*,
   348 F.3d 726 (8th Cir. 2003) .................................................................27

*Gates v. Strain*,
   885 F.3d 874 (5th Cir. 2018) ..............................................................9, 18

*Gbalazeh v. City of Dall., Tex.*,
   394 F. Supp. 3d 666 (N.D. Tex. 2019) ..................................................20

*Giese v. Jackson*, No. 3:19-CV-00081,
   2020 WL 3493078 (S.D. Tex. May 27, 2020), *report and recommendation
   adopted*, No. 3:19-CV-0081, 2020 WL 3490219 (S.D. Tex. June 26, 2020) ......28

*Hand v. Gary*,
   838 F.2d 1420 (5th Cir. 1988) ...............................................................12

*Harrison v. Young*,
   48 F.4th 331 (5th Cir. 2022) ...........................................................10, 16

*Hayes v. Dahlke*,
   976 F.3d 259 (2d Cir. 2020) ...................................................................27

*Izen v. Catalina*,
   398 F.3d 363 (5th Cir. 2005) ...........................................................30, 32

*Joseph Burstyn, Inc. v. Wilson*,
   343 U.S. 495 (1952) ...............................................................................22

*Juidice v. Vail*,
   430 U.S. 327 (1977) ...............................................................................18

*Kaplan v. California*,
   413 U.S. 115 (1973) ...............................................................................22

*Keenan v. Tejeda*,
   290 F.3d 252 (5th Cir. 2002) .......................................................25, 26, 30

*Kugler v. Helfant*,
  421 U.S. 117 (1975) ................................................................. 17, 21

*Marcus v. Search Warrants of Prop. at 104 E. Tenth St., Kansas City, Mo.*,
  367 U.S. 717 (1961) ....................................................................23

*Matthews v. Kountze Indep. Sch. Dist.*,
  484 S.W.3d 416 (Tex. 2016) .........................................................20

*McLin v. Ard*,
  866 F.3d 682 (5th Cir. 2017) .........................................................26

*Mendocino Env't Ctr. v. Mendocino Cty.*,
  192 F.3d 1283 (9th Cir. 1999) .......................................................29

*Mirabella v. Villard*,
  853 F.3d 641 (3d Cir. 2017) ..........................................................27

*Moore v. Sims*,
  442 U.S. 415 (1979) .....................................................................18

*Morris v. Powell*,
  449 F.3d 682 (5th Cir. 2006) .................................................... 26, 28

*Mulholland v. Marion Cty. Election Bd.*,
  746 F.3d 811 (7th Cir. 2014) .........................................................18

*Okorie v. Miss. Bd. of Med. Licensure*,
  739 F. App'x 301 (5th Cir. 2018) ...................................................18

*Perry v. Sindermann*,
  408 U.S. 593 (1972) .....................................................................31

*Police Dept. of Chi. v. Mosley*,
  408 U.S. 92 (1972) .......................................................................22

*Schad v. Borough of Mount Ephraim*,
  452 U.S. 61 (1981) .................................................................. 15, 22

*Shaw v. Garrison*,
  467 F.2d 113 (5th Cir. 1972) .........................................................12

*Sheridan v. Garrison*,
  415 F.2d 699 (5th Cir. 1969) .................................................... 12, 13

*Smith v. California*,
  361 U.S. 147 (1959) .....................................................................23

*Smith v. Plati*,
  258 F.3d 1167 (10th Cir. 2001) .....................................................27

*Speiser v. Randall*,
    357 U.S. 513 (1958) ........................................................................31

*Stratta v. Roe*,
    961 F.3d 340 (5th Cir. 2020) .......................................................10

*Sure–Tan, Inc. v. NLRB*,
    467 U.S. 883 (1984) ............................................................ 15, 25

*Surita v. Hyde*,
    665 F.3d 860 (7th Cir. 2011) .......................................................27

*Thaddeus-X v. Blatter*,
    175 F.3d 378 (6th Cir. 1999) .......................................................27

*Toolasprashad v. Bureau of Prisons*,
    286 F.3d 576 (D.C. Cir. 2002).....................................................27

*Turner Broad. System, Inc. v. FCC*,
    512 U.S. 622 (1994) .....................................................................22

*Villarreal v. City of Laredo, Tex.*,
    52 F.4th 265 (5th Cir. 2022) .......................................................28

*Wilson v. Thompson*,
    593 F.2d 1375 (5th Cir. 1979) ............................................. passim

*Younger v. Harris*,
    401 U.S. 37 (1971) ............................................................... passim

*Zwickler v. Koota*,
    389 U.S. 241 (1967) .....................................................................13

**Rules and Statutes**

Fed. R. App. P. 29(a)(4)(E) ..............................................................7

Fed. R. App. P. 29(b)(4) ....................................................................7

Fifth Cir. Rule 28.7 ........................................................................18

**Other Authorities**

*Developments in the Law—Section 1983 and Federalism*,
    90 HARV. L. REV. 1133 (1977) ..................................................12

U.S. CONST., amend. I ....................................................................25

## STATEMENT OF AMICI CURIAE[1]

*Amici curiae* Cortelyou Kenney, Gregg Leslie, the Stanton Foundation First Amendment Clinic at Vanderbilt Law School, and the Southern Methodist University Dedman School of Law First Amendment Clinic (collectively, "First Amendment Scholars and Clinics") are legal scholars and institutions who devote a substantial amount of their teaching and legal research to First Amendment rights and federalist traditions. They are thus interested in the outcome of this appeal, which juxtaposes those two concepts within the broader context of *Younger* abstention. A full description of each *amicus* is included in the Unopposed Motion for Leave to File Amicus Brief and the Appendix.

---

[1] No party's counsel authored this brief in whole or in part. No party, or party's counsel, made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *amici curiae* or their counsel made such a monetary contribution. *See* Fed. R. App. P. 29(a)(4)(E), (b)(4).

All named parties do not oppose the filing of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The District Court preliminarily enjoined Tyler County (Texas) District Attorney Lucas Babin from prosecuting Netflix's dissemination of the French film, *Cuties*, under two Texas Penal Code statutes: (1) Section 43.262 (Babin's "Original Indictment"), which was invalidated by the state's First Court of Appeals, and (2) Section 43.25 (Babin's "New Indictments"), a child pornography statute. ROA.1630. The District Court's decision hinged on the correct conclusion that *Younger* abstention was inapplicable.

This Court should uphold the District Court's injunction and hold that the *Younger* abstention doctrine does not prevent the limited exercise of federal jurisdiction that the District Court invoked to preliminarily enjoin Babin's prosecution. The considerations central to *Younger*'s holding—comity and equitable restraint—support Netflix's right to seek redress in a federal forum to vindicate its First Amendment rights, which are thwarted by Babin's rogue prosecution. Affirming the decision below would additionally reinforce two core First Amendment protections: the right of content distributors to disseminate films without fear of bad faith harassment from prosecutorial authorities, and the ability of citizens to seek judicial redress for a prosecutor's unlawful retaliation for the exercise of their constitutional rights.

# ARGUMENT

## I. *Younger*'s Core Principles Support Conferring Federal Jurisdiction.

*Younger* abstention lies at the heart of the State's appeal. Opening Br. at 1 ("This suit should have been a textbook case for abstention under *Younger v. Harris,* 401 U.S. 37 (1971)."). Under this familiar doctrine, federal courts generally abstain from matters related to a state criminal proceeding if three prerequisites are satisfied: (1) the "proceeding would interfere with an ongoing state judicial proceeding"; (2) "the state has an important interest in regulating the subject matter of the claim"; and (3) "the plaintiff has an adequate opportunity in the state proceedings to raise constitutional challenges." *Bice v. La. Pub. Def. Bd.*, 677 F.3d 712, 716 (5th Cir. 2012) (quotations omitted).

*Younger* did not, however, erect an absolute ban on federal court involvement in state criminal proceedings. In particular, federal courts may retain jurisdiction and enjoin a state criminal proceeding in exceptional circumstances—including if: (1) "the state-court proceeding was brought in bad faith or to harass the federal plaintiff"; (2) "the federal plaintiff seeks to challenge a state statute that is 'flagrantly and patently violative of express constitutional prohibitions'"; or (3) "where other 'extraordinary circumstances' threaten 'irreparable loss [that] is both great and immediate.'" *Gates v. Strain*, 885 F.3d 874, 880 (5th Cir. 2018) (quoting *Younger*, 401 U.S. at 45).

9

Babin and the State present a mechanical application of the *Younger* requirements and exceptions as distinct inquiries. *See* Opening Br. at 10 (analyzing the *Younger* requirements), 14 (addressing the bad-faith exception to *Younger* abstention). But a superior approach—and in particular one that promises superior protection of a citizen's proper exercise of their constitutional rights—considers the rule and its exceptions concurrently. As the District Court noted, the two tests form flip sides of the same coin: "whether it is because the second and third *Younger* elements are not met, or because the bad faith *Younger* exception applies, the result is the same: federal courts may enjoin a state court prosecution brought in bad faith." ROA.1642. The relationship to which the District Court referred is not mere coincidence; instead, the *Younger* requirements and exceptions both serve to advance the two foundational principles underpinning the doctrine: comity and equitable restraint. And a robust analysis of those central principles against the record yields a straightforward conclusion: the District Court correctly exercised jurisdiction to preliminarily enjoin Babin's prosecution.[2]

---

[2] This Court "review[s] an abstention ruling for abuse of discretion, but [it] reviews de novo whether the requirements of a particular abstention doctrine are satisfied." *Stratta v. Roe*, 961 F.3d 340, 356 (5th Cir. 2020) (internal quotation marks omitted). A preliminary injunction decision is reviewed "for abuse of discretion, reviewing underlying factual findings for clear error and legal conclusions de novo." *Harrison v. Young*, 48 F.4th 331, 339 (5th Cir. 2022) (citing *Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 696 (5th Cir. 2018)).

### A.    Comity: The State Has No Proper Interest in Pursuing a Prosecution Brought in Bad Faith or for Purposes of Harassment.

Central to *Younger* and its progeny is a "vital" concept forged within "the profound debates that ushered our Federal Constitution into existence": comity. *Younger*, 401 U.S. at 44. As the Supreme Court explained:

> [Comity represents] a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.

*Id.* But comity neither compels nor even suggests "blind deference to [s]tates' [r]ights any more than it means centralization of control over every important issue in our National Government." *Id.* Instead, the principle envisions a balanced system that respects "the legitimate interests of *both* State and National Governments." *Id.* (emphasis added). Thus, when federal rights are at stake, comity directs federal courts to "endeavor[] [to protect those interests] in ways that will not unduly interfere with the legitimate activities of the States." *Id.*

A state criminal prosecution brought either in bad faith or for purposes of harassment falls outside the balance that *Younger* mandates for multiple reasons. First, comity—and the corresponding deference that *Younger* generally affords to state prosecutions—relies upon the "State's legitimate pursuit of its substantive interests." *Wilson v. Thompson*, 593 F.2d 1375, 1383 (5th Cir. 1979). But a state

has no "legitimate interest in pursuing a bad faith prosecution brought to retaliate for or to deter the exercise of constitutionally protected rights." *Id.*

Second, federal intervention is warranted, and indeed is necessary, under *Younger* when a defendant seeks relief from a state prosecution tainted with bad faith or harassment. Netflix, like any individual or corporate entity, holds a "federal right to be free from bad faith prosecutions." *Shaw v. Garrison*, 467 F.2d 113, 120 (5th Cir. 1972); *see also Hand v. Gary*, 838 F.2d 1420, 1424 (5th Cir. 1988). *Younger* abstention presumes that, within a state criminal proceeding, the act of "being prosecuted under an arguably (or actually) invalid law is not itself" a constitutional deprivation. *Developments in the Law—Section 1983 and Federalism*, 90 HARV. L. REV. 1133, 1286 (1977) (emphasis omitted). But when the allegation upon which an injunction suit is based is that the "state's legal machinery is being used in bad faith," relying "upon comity is to beg the question." *Sheridan v. Garrison*, 415 F.2d 699, 707 (5th Cir. 1969). Stated otherwise, "[t]he justification for comity disappears if the [bad faith or harassment] allegation is proved true, and allowing the state to continue will defeat policies that, in such cases, are more important than comity." *Id.*

This federal interest takes on increased significance when the First Amendment—distinct from the Fourth, Fifth, or Sixth Amendment arguments that routinely attend a criminal matter—is threatened by a bad-faith prosecution.

"Speech is an evanescent thing.  To be effective it must be timely."  *Garrison*, 415 F.2d at 706.  Yet the effectiveness of speech is thwarted by a prosecution brought in bad faith, as the prosecution imposes a "chilling effect upon the exercise of First Amendment rights" regardless of whether it is ultimately successful or not. *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965).   Accordingly, "[w]hen a significant chilling effect on free speech is created by a bad faith prosecution, the prosecution will thus as a matter of law cause irreparable injury regardless of its outcome, and the federal courts cannot abstain from issuing an injunction." *Wilson*, 593 F.2d at 1383 (emphasis added).

Third, a federal court's abstention from blocking an improper state prosecution denies an aggrieved defendant adequate redress.  When a party is confronted with charges asserted by the state in bad faith or to harass, submitting to the state's procedures and defending against the "criminal prosecution will not assure adequate vindication of constitutional rights." *Younger*, 401 U.S. at 48–49 (quoting *Dombrowski*, 380 U.S. at 489).  The problem is not only procedural, but also temporal: forcing aggrieved parties to "suffer the delay of state court proceedings might itself effect the impermissible chilling of the very constitutional right" they seek to protect. *Zwickler v. Koota*, 389 U.S. 241, 251–52 (1967); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment

freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

These three issues—the absence of a legitimate state interest in a bad-faith or harassing criminal prosecution, the presence of a paramount federal interest, and the delay—or ultimate denial—of redress for the constitutional violation that the state's prosecution represents—all point to the propriety of the federal court's exercise of jurisdiction and against federal court abstention under *Younger.* These doctrinal concerns not only underpin the bad faith/harassment exception, *see Younger*, 401 U.S. at 49–50, but they are also crucial considerations in assessing whether the prerequisites for abstention itself are even present. *Bice*, 677 F.3d at 716 (requiring that "the state has an important interest in regulating the subject matter of the claim").

With these comity-based principles in mind, the impropriety—and indeed danger—of abstaining here becomes apparent. As noted in the District Court's opinion, ROA.1642–48, and in Netflix's brief, the record below demonstrates that Babin's prosecution was brought in bad faith, Netflix Br. at 32–38, or for purposes of harassment, *id.* at 25–32. That finding, amply supported by the record (and at a minimum not clearly erroneous), eliminates the state interest from consideration under *Younger*'s comity prong because the State has no "legitimate interest in pursuing a bad faith prosecution." *Wilson*, 593 F.2d at 1383. Meanwhile, as

discussed further below, Babin's indictments directly implicate two of Netflix's First Amendment rights: the right to distribute artistic content, *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981) (motion pictures "fall within the First Amendment guarantee"), and the right to petition "courts for redress of wrongs" without undue retaliation, *Sure–Tan, Inc. v. NLRB*, 467 U.S. 883, 896–97 (1984). Accordingly, *Younger*'s comity principle tips sharply in Netflix's favor, as only federal interests—and no legitimate state interests—are present.

One final point on the bad-faith exception—the need for prompt intervention to grant relief to a criminal defendant where warranted—is worth highlighting. *Post hoc* remedies, such as a Section 1983 suit seeking damages, can in some circumstances suffice to redress harms perpetrated by state officials. But a prosecution brought in bad faith or for purposes of harassment "establish[es] the threat of irreparable injury" to constitutional rights that necessitates immediate redress from a federal court.[3] *Dombrowski*, 380 U.S. at 490. The core issue that

---

[3] This point from *Dombrowski*—that delays associated with court proceedings may violate a state defendant's constitutional rights—also explains why the State's alternative suggestion that the District Court should have resolved this matter "on statutory rather than constitutional grounds" does not suffice. Opening Br. at 12 (citation omitted). The bad-faith *Younger* exception exists to allow federal courts to avoid drawn-out proceedings and limit the deprivation of rights that a harassed party suffers. *Dombrowski*, 380 U.S. at 490 (the possibility that a harassed party would eventually be acquitted is "irrelevant" because such an outcome cannot address "the impropriety of [a state official's] invo[cation of] the statute in bad faith to impose continuing harassment in order to discourage appellants' activities.").

*Younger*'s bad-faith exception addresses is "that state officials are using or threatening to use prosecutions, *regardless of their outcome*, as instrumentalities for the suppression of speech." *Wilson*, 593 F.2d at 1383 (emphasis in original). Federal court abstention in the face of such abuse "subject[s] those affected to the uncertainties and vagaries of criminal prosecution"—an unsatisfactory result because the affected party "demand[s] no less than freedom from prosecution." *Dombrowski*, 380 U.S. at 492.

On this record—which *lacks* the several after-the-fact explanations that the State now proffers for the first time on appeal to sustain Babin's misconduct[4]— the District Court neither clearly erred in finding that Babin's prosecutions were brought in bad faith and for harassment, nor abused its discretion in preliminary enjoining Babin from proceeding with his prosecution of tainted charges. *Harrison*, 48 F.4th at 339; ROA.1642–48 (findings of bad faith and harassment), ROA.1648–54 (preliminary injunction factors). And the exercise of federal jurisdiction to enjoin Babin's conduct is consistent with *Younger*'s lodestar, as intervention here heeds the Supreme Court's instruction to "vindicate and protect federal rights and federal

---

[4] *See. e.g.*, Netflix Br. at 25–26 (citing Opening Br. at 35–36) (Babin asserting, for the first time on appeal, that state habeas petitions are not safeguarded by the Bill of Rights); *id.* at 30 (citing Opening Br. at 39–40) (Babin alleging, for the first time on appeal, that his decision to pursue the New Indictments *was* connected to the invalidation of the statute underpinning the Original Indictment).

interests" in a way that "will not unduly interfere with the *legitimate* activities of the States." *Younger*, 401 U.S. at 44 (emphasis added).

## B.    Equitable Restraint: Netflix Cannot Adequately Raise Its Federal Claims in the State's Courts

*Younger* abstention is also rooted in a second, independent principle: equitable restraint—that is, a presumption that a federal court will not act if there is an adequate remedy in the state courts.  This restraint prong of the *Younger* analysis is "founded on the premise that ordinarily a pending state prosecution provides the accused a fair and sufficient opportunity for vindication of federal constitutional rights." *Kugler v. Helfant*, 421 U.S. 117, 124–25 (1975).  Accordingly, only "extraordinary circumstances [that] render the state court incapable of fairly and fully adjudicating the federal issues before it" warrant departing from the deference afforded to a state to adjudicate its own criminal prosecutions.  *Id.*

Again, this core *Younger* tenet informs both the criteria that warrant abstention and the exceptions that allow federal courts to exercise jurisdiction. *Younger* abstention is permissible only if the federal plaintiff has "an adequate opportunity in the state proceedings to raise constitutional challenges." *Bice*, 677 F.3d at 716 (quotation marks omitted).  On the flip side, abstention is improper if "other extraordinary circumstances"—including a state court's inability to "fully adjudicat[e] the federal issues before it," *Kugler*, 421 U.S. at 124—threaten

"irreparable loss [that] is both great and immediate." *Gates*, 885 F.3d at 880 (5th Cir. 2018) (quotation marks omitted).[5]

Thus, even were this Court to somehow find clear error in the District Court's factual determinations and hold that Babin's actions reflected a legitimate state interest, the State still must demonstrate that its courts can offer Netflix a genuine "opportunity to press" its federal claims. *Moore v. Sims*, 442 U.S. 415, 432 (1979) (citing *Juidice v. Vail*, 430 U.S. 327, 336–37 (1977)). In many ordinary state prosecutions, the State can meet this mandate by affording a criminal defendant "an opportunity to raise federal claims in the course of state proceedings." *Daves v. Dallas Cty., Tex.*, No. 18-11368, 2023 WL 2720444, at *9 (5th Cir. Mar. 31, 2023). But this case is no ordinary prosecution, as Babin's prosecutorial authority affords him unfettered discretion to prevent Netflix from accessing Texas courts and presenting its federal claims.

---

[5] While the Supreme Court has not delineated an exhaustive list of situations that constitute "other extraordinary circumstances" and exclude *Younger*'s application, examples identified by the circuit courts include: (1) bias in a state proceeding, *see Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 101–02 (4th Cir. 2022); *Okorie v. Miss. Bd. of Med. Licensure*, 739 F. App'x 301, 302 (5th Cir. 2018) (cited pursuant to Fifth Circuit Rule 28.7); (2) enforcement of a state law that a federal court has already ruled unconstitutional, *Mulholland v. Marion Cty. Election Bd.*, 746 F.3d 811, 819 (7th Cir. 2014); and (3) a state prosecution that, if undertaken, would violate the Constitution's Double Jeopardy Clause, *Dominguez v. Kernan*, 906 F.3d 1127, 1131 n.5 (9th Cir. 2018).

This dynamic is not for lack of effort from Netflix; Netflix affirmatively sought habeas relief after Babin refused to withdraw the Original Indictment (an indictment that stemmed from an invalidated statute).  ROA.1084; *see also Daves*, 2023 WL 2720444 at *9 ("[C]ollateral proceedings like habeas" can afford an adequate state remedy).  But Babin responded on the eve of the habeas hearing by presenting four new charges based on a *different* state statute—a tactic that nullified Netflix's habeas petition, as pretrial habeas relief under Texas law can be granted only (1) in response to facial challenges to statutes and (2) if a successful challenge provides *complete* relief to a petitioner.  New Indictments, ROA.1183–86; *see, e.g., Ex parte Bishai*, No. 09-21-00158-CR, 2021 WL 5498211, at *4–5 (Tex. App.—Beaumont Nov. 24, 2021), *pet. for discretionary review granted* (Feb. 9, 2022), *pet. for discretionary review dismissed*, No. PD-0935-21, 2022 WL 698178 (Tex. Crim. App. Mar. 9, 2022).  And any decision by Babin to refrain from pressing charges, as he did with the Original Indictment, *see* Babin's Motion to Dismiss, ROA.1187, is shielded by absolute prosecutorial immunity—even if the decision was made in bad faith.  *Charleston v. Pate*, 194 S.W.3d 89, 91 (Tex. App.—Texarkana 2006, *no pet.*) ("Absolute immunity protects a prosecutor even if the prosecutor acts in bad faith or with ulterior motives.").[6]

---

[6] Though not implicated on this record, Babin also holds the ability to *moot* any state proceeding—upon which Netflix's pendent federal claims are based—by withdrawing, *with* prejudice, any of the Tyler County Grand Jury's indictments.

A separate, serious question also remains as to whether Netflix can "obtain an *adequate* remedy for the putative violations" of its constitutional rights in a state proceeding. *Bice*, 677 F.3d at 719 (emphasis added). If forced to litigate in state court, Netflix, as a matter of trial strategy, cannot practically argue that Babin is wielding the prosecutorial process—including the state trial itself—"as [an] instrumentalit[y] for the suppression of speech." *Wilson*, 593 F.2d at 1383. And while state courts are capable of acquitting Netflix of any charges that Babin commits to, Netflix's true concern lies in the exercise of its First Amendment rights. Said otherwise, Netflix's claims "are about more than fighting an arrest or citation," and the State's courts "cannot grant an injunction" enabling Netflix to legally engage in protected activity without fear of serial prosecution from Babin. *Gbalazeh v. City of Dall., Tex.*, 394 F. Supp. 3d 666, 670 (N.D. Tex. 2019).

Babin thus wields a prosecutorial sword of Damocles over Netflix: his ability to—and indeed, practice of—adjusting indictments not only prevents the State's courts from continuing with a judicial proceeding where Netflix threatens or even asserts a constitutional challenge; in the process, the same prosecutorial conduct deprives Netflix of any meaningful opportunity to "raise federal claims in the course of state proceedings." *Daves*, 2023 WL 2720444, at *9. Yet Babin can continue to

---

*Matthews v. Kountze Indep. Sch. Dist.*, 484 S.W.3d 416, 418 (Tex. 2016) (Texas courts cannot render decisions in moot cases).

harass Netflix and impinge meaningfully on Netflix's First Amendment rights with serial indictments, apparently without consequence.  It cannot be that *Younger*'s principle of equitable restraint contemplates federal plaintiffs being forced into a Scylla-or-Charybdis situation to vindicate their First Amendment freedoms.[7]  Under these uncommon, but oppressive circumstances, federal intervention is critical to allow "the accused a fair and sufficient opportunity for vindication of federal constitutional rights." *Kugler*, 421 U.S. at 124–25.

## II.    Abstaining Would Profoundly Injure Distributors' First Amendment Rights

Obscured by the State's *Younger* analysis are the significant First Amendment considerations embedded within this dispute.  This broader context is critical. Overturning the District Court's preliminary injunction in favor of *Younger* abstention would infringe upon fundamental First Amendment rights that Netflix seeks to vindicate.  These protections—rights that the courts have consistently recognized—shield content distributors from liability for disseminating artistic

---

[7] According to Greek mythology, Scylla was a monster living in a cave overlooking the body of water that separates the island of Sicily from the rest of Italy. Immediately adjacent to Scylla's cave was a whirlpool named Charybdis.  When seafarers attempted to navigate the strait, they faced the repugnant alternatives of either being devoured by Scylla, or being drowned by Charybdis' deadly waters. HOMER, THE ODYSSEY, 12:100–140 (Ian Johnston trans., 2019), available at http://johnstoniatexts.x10host.com/homer/odysseyallpdf.pdf.

works, and enshrine a freedom to petition the government for redress without the threat of retaliation.

### A.    Abstention Would Undermine First Amendment Protections for the Creation and Distribution of Motion Pictures

Supreme Court pronouncements over at least the past half-century make clear that films such as *Cuties* are protected under the First Amendment.  *Schad*, 452 U.S. at 65 (motion pictures "fall within the First Amendment guarantee"); *Kaplan v. California*, 413 U.S. 115, 119–20 (1973) (films "have First Amendment protection").  Constitutional protection of films as a form of expression is deeply rooted in the law:

> [M]otion pictures are a significant medium for the communication of ideas.  They may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought which characterizes all artistic expression.

*Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952).  A government "has no power to restrict expression because of its message [or] its ideas."  *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972).  Motion pictures accordingly receive First Amendment protection because our nation's "cultural life," just like political debate, "rest[s] upon [the] ideal" of governmental viewpoint neutrality.  *Turner Broad. System, Inc. v. FCC*, 512 U.S. 622, 641 (1994).

Importantly, the First Amendment protections enjoyed by film creators extend also to the distributors of such content.  This bedrock principle flows from a

straightforward recognition that a government could just as effectively silence the expressive nature of creative content by inhibiting its distribution instead of its creation. *Smith v. California*, 361 U.S. 147, 152–53 (1959) (if threatened with a penalty for distributing certain types of content, distributors would "restrict the books [they] sell[] to those [they have] inspected; and thus the State will have imposed a restriction" on distributing constitutionally protected works). State-created regulations on content distributors, whether criminal and punitive, or informal and advisory in nature, are accordingly carefully scrutinized because they carry the ability to effectively "stop[] the circulation" of protected content. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68 (1963); *see also Smith*, 361 U.S. at 152–53.

Babin's conduct raises particular concerns because it subverts the balance the Supreme Court has crafted between vindicating film distributors' First Amendment rights and affirming the government's responsibility to prevent distribution of child pornography or obscene material. States are not free to adopt procedures regulating lewd or salacious content "without regard to the possible consequences for constitutionally protected speech." *Marcus v. Search Warrants of Prop. at 104 E. Tenth St., Kansas City, Mo*., 367 U.S. 717, 731 (1961). The Supreme Court has accordingly recognized a two-prong procedural safeguard for addressing potentially obscene or unlawfully pornographic content: first, "the State bear[s] the burden of persuasion to show that the [distributors] engaged in criminal speech," and second,

23

any procedure must "assure a prompt final judicial decision." *Freedman v. State of Md.*, 380 U.S. 51, 58-59 (1965).

In initiating criminal prosecutions, Babin has assumed the responsibility of proving beyond a reasonable doubt Netflix's criminal liability for distributing *Cuties*. But his conduct in replacing his Original Indictment with new charges makes a prompt final judicial decision over the legality of the film's distribution illusory. *Cf. Freedman*, 380 U.S. at 55, 60 (holding that a period of ten months—four months for an "initial judicial determination" and six months for "final vindication of the film on appellate review"—"provides no assurance of a prompt judicial determination"). As Netflix urges, Babin has wielded his prosecutorial authority to pivot between charges based on an invalidated statute (the Original Indictment) and implausible interpretations of the Texas Penal Code (the New Indictments), all the while preventing Netflix from securing habeas (or other constitutional) review. Netflix Br. at 9–13. And although Netflix is fortunate to hold sufficient resources to challenge Babin's misconduct, the same cannot be said for smaller film distributors—or others who face infringement of their First Amendment rights and are unable to withstand serial prosecutions from a rogue[8] District Attorney. Were this Court to overturn the District Court's preliminary injunction, it would not

---

[8] As Netflix notes, Babin "remains the only prosecutor in America to pursue and indict Netflix for promoting *Cuties*—not once but *five* times." Netflix Br. at 4.

merely signal approval of Babin's prosecutorial conduct, but also chill the ability of film distributors to fulfill their role of distributing artistic content without fear of being forced to vindicate their First Amendment rights in a drawn out, bad-faith state proceeding.

**B.    This Court Should Confirm the Use of An Objective Test to Evaluate First Amendment Retaliation Claims**

Babin's conduct also violated another First Amendment guarantee: the Petition Clause.   The federal Constitution prohibits governments from unduly restricting the right "to petition the Government for a redress of grievances."  U.S. CONST., amend. I.  It is undisputed that "the right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government." *Sure–Tan, Inc.*, 467 U.S. at 896–97 (1984).  And in alleging that Babin's decision to seek his New Indictments was motivated by Netflix's filing for habeas relief, *see* ROA.0034–36, Netflix has alleged a substantial Petition Clause concern.

Rather than taking issue with Netflix's retaliation claim, the State tries to divert from it, asserting that Netflix has not demonstrated changes in "its behavior as a result of such an indictment."  Opening Br. at 37 (citing *Keenan v. Tejeda*, 290 F.3d 252, 258–59 (5th Cir. 2002)).  The State says that retaliation claims in the Fifth Circuit require that a plaintiff subjectively demonstrate either that their "exercise of free speech has been curtailed" or "the defendant's actions caused [them] to suffer an injury that would chill a person of ordinary firmness from continuing to engage

in that activity." *Id.* at 36–37 (quoting *McLin v. Ard*, 866 F.3d 682, 696 (5th Cir. 2017)).  But as Netflix correctly notes, the State is confusing retaliation standards here: "First Amendment retaliation claims fail where probable cause exists . . . [b]ut courts may refuse to abstain under *Younger* regardless of whether valid convictions conceivably could be obtained."  Netflix Br. at 40 (citations and quotations omitted).  And the District Court only granted relief on Netflix's *Younger* retaliation claims, not Netflix's First Amendment retaliation claims.  *See* ROA.1650–51 (holding that Netflix was likely to succeed on Counts II and III, its *Younger* retaliation claims); ROA.1651–53 (not awarding relief on Count IV, Netflix's First Amendment retaliation claim).

Insofar as the First Amendment retaliation standard is germane to this appeal, this Court's use of a subjective test for First Amendment retaliation claims has been inconsistent.  And to the extent it has employed a subjective test, the approach conflicts with that taken by every other Court of Appeals, and indeed with some opinions by this Court.[9]  Four years after *Keenan*, in *Morris v. Powell*, 449 F.3d 682

---

[9] A survey of the Courts of Appeals reflects that this Court's use at times of a subjective test differs from the approach taken by all other federal Courts of Appeals. Every other Circuit has adopted an objective test to evaluate First Amendment retaliation claims:

- **First Circuit**: *Barton v. Clancy*, 632 F.3d 9, 29 (1st Cir. 2011) ("pertinent question" in a First Amendment retaliation case is whether the defendant's actions "would deter a reasonably hardy individual from exercising his constitutional rights") (internal quotation and alteration omitted).

- **Second Circuit**: *Hayes v. Dahlke*, <u>976 F.3d 259, 272</u> (2d Cir. 2020) ("To be an adverse action, retaliatory conduct must be the type that would deter a similarly situated individual of ordinary firmness from exercising [their] constitutional rights.") (internal quotation omitted).

- **Third Circuit**: *Mirabella v. Villard*, <u>853 F.3d 641, 650</u> (3d Cir. 2017) (core inquiry is "whether the act would deter a person of ordinary firmness, not whether the plaintiff was deterred").

- **Fourth Circuit**: *Constantine v. Rectors & Visitors of George Mason Univ.*, <u>411 F.3d 474, 500</u> (4th Cir. 2005) ("reject[ing]" the suggestion that the retaliation "inquiry depends upon the actual effect of the retaliatory conduct on a particular plaintiff").

- **Sixth Circuit**: *Thaddeus-X v. Blatter*, <u>175 F.3d 378, 396</u> (6th Cir. 1999) ("[A]n adverse action is one that would 'deter a person of ordinary firmness' from the exercise of the right at stake.").

- **Seventh Circuit**: *Surita v. Hyde*, <u>665 F.3d 860, 878</u> (7th Cir. 2011) ("apply[ing] an objective test:  whether the alleged conduct by the defendants would likely deter a person of ordinary firmness from continuing to engage in protected activity.");

- **Eighth Circuit**: *Garcia v. City of Trenton*, <u>348 F.3d 726, 729</u> (8th Cir. 2003) ("The test is an objective one, not subjective.").

- **Ninth Circuit**: *Capp v. Cty. of San Diego*, <u>940 F.3d 1046, 1054</u> (9th Cir. 2019) (the inquiry is not whether a defendant's actions actually chilled a plaintiff, "but rather whether the alleged retaliation would chill a person of ordinary firmness from continuing to engage in the protected activity.") (internal quotation omitted).

- **Tenth Circuit**: *Smith v. Plati*, <u>258 F.3d 1167, 1177</u> (10th Cir. 2001) ("focus [ ] is upon whether a person of ordinary firmness would be chilled, rather than whether the particular plaintiff is chilled").

- **Eleventh Circuit**: *Bennett v. Hendrix*, <u>423 F.3d 1247, 1251</u> (11th Cir. 2005) ("join[ing] our sister Circuits in adopting an objective test for proving a retaliation claim").

- **D.C. Circuit**: *Toolasprashad v. Bureau of Prisons*, <u>286 F.3d 576, 585</u> (D.C. Cir. 2002) (standard "depends on whether the harassment is likely to deter a person of ordinary firmness from that exercise").

(5th Cir. 2006), this Court overturned a district court's dismissal of an incarcerated individual's First Amendment retaliation claim. *Id.* at 683. Although the incarcerated individual in *Morris* failed to demonstrate curtailment of his First Amendment rights, this Court used an objective test, observing that the government's actions, when construed "as a penalty for the exercise of constitutional rights[,] [had] *the potential to deter the inmate* from the future exercise of those rights." *Id.* at 687 (emphasis added). And while *Morris* and its progeny primarily feature retaliation claims brought by persons in prison, there is no reason that the same objective test cannot and should not apply to those persons not incarcerated. *See Giese v. Jackson*, No. 3:19-CV-00081, 2020 WL 3493078, at *6 (S.D. Tex. May 27, 2020), *report and recommendation adopted*, No. 3:19-CV-0081, 2020 WL 3490219 (S.D. Tex. June 26, 2020) (refusing to apply a subjective test to an incarcerated individual's First Amendment retaliation claim).

In any event, the issue of whether this Circuit should use an objective or subjective test to assess First Amendment retaliation claims is currently under submission to this Court *en banc* in *Villarreal v. City of Laredo, Tex.*, 52 F.4th 265 (5th Cir. 2022) (granting rehearing *en banc*)—a case that explores in detail the importance of adopting an objective standard. This appeal presents the Court with a further opportunity to observe the many salutary effects of an objective standard for assessing First Amendment retaliation claims—effects that are not limited to this

28

Court aligning itself with all of the other federal Circuit Courts of Appeals. For one thing, differentiating claims by the reaction of the plaintiff, as the subjective test does, leads to absurd results. "[I]f a police officer to whom a criminal complaint is made beat the complainant on the head with a nightstick to punish [them] for making the complaint, surely the law would not deny [the complainant] a remedy because [they] continue[] to complain thereafter." *Estate of Morris v. Dapolito*, 297 F. Supp. 2d 680, 694 n.12 (S.D.N.Y. 2004). And the use of a subjective test may encourage officials to target the parties that are most committed to or capable of continuing their protected activity. There ought to be "no reason to reward government officials for picking on unusually hardy speakers." *Bennett*, 423 F.3d at 1252 (quotation omitted); *see also Mendocino Env't Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) ("[I]t would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in [their] protected activity.").

Furthermore, government-actor liability under the subjective test can be inconsistent and unpredictable. As the Eleventh Circuit noted, the "objective standard provides notice to government officials of when their retaliatory actions violate a plaintiff's First Amendment rights." *Bennett*, 423 F.3d at 1251. On the other hand, a subjective test "expose[s] public officials to liability in some cases, but not in others, for the very same conduct, depending upon the plaintiff's will to fight."

*Id*. at 1251–52 (quoting *Constantine*, 411 F.3d at 500). Protection of core constitutional rights is no place for caprice.

And use of a subjective test may be inconsistent with this Circuit's holdings. The First Amendment prohibits "adverse government action against an individual because of [their] exercise of First Amendment freedoms," *Colson v. Grohman*, 174 F.3d 498, 508 (5th Cir. 1999), and subjecting a party "to criminal investigation and prosecution with the substantial motivation" of dissuading exercise of their constitutional rights "would violate the First Amendment." *Izen v. Catalina*, 398 F.3d 363, 367 (5th Cir. 2005). It is therefore anomalous to require a subjective test and hold that Netflix cannot vindicate that violation solely because it had the resilience to continue showing movies that may offend Babin's sensibilities.

Lastly, the very case upon which this Court's use of the subjective test rests—*Keenan*—employs flawed reasoning. The *Keenan* panel adopted the subjective test because "[Section] 1983 is a tort statute and . . . [a] tort to be actionable requires injury." 290 F.3d at 259 (quotation omitted). The *Keenan* panel reasoned that such an injury, in the context of a retaliation claim, must take the form of "the deprivation of a constitutional right," concluding that no such deprivation could exist absent an actual "showing that the plaintiffs' exercise of free speech has been curtailed." *Id*. This reasoning misconstrues the nature of the necessary injury. A First Amendment retaliation claim "depends not on the denial of a constitutional right, but on the

[retaliation the plaintiff] received for exercising [their] rights." *Bennett*, 423 F.3d at 1253. And "[t]he reason why such retaliation offends the Constitution is that it *threatens* to inhibit exercise of the protected right." *Crawford-El v. Britton*, 523 U.S. 574, 588 n.10 (1998) (emphasis added).

In this sense, retaliation is "akin to an unconstitutional condition demanded for the receipt of a government-provided benefit." *Id.* (quotation omitted). As the Supreme Court has explained, "[i]f the government could deny a benefit to a person because of [their] constitutionally protected speech or associations, [their] exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which [it] could not command directly.'" *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)). "Such interference with constitutional rights is impermissible." *Id.* It would defy reason to say that a plaintiff who was unconstitutionally denied a public benefit was not "injured" unless the plaintiff stopped exercising the rights at issue. Likewise, a victim of retaliation is injured by a defendant's attempts to penalize the person's speech—whether or not those attempts ultimately succeed in stifling them.

Under an objective test, it is beyond reasonable dispute that Netflix was injured. As the District Court correctly found, it was re-indicted with a renewed slate of dubious charges for exercising its constitutionally-protected right to petition for habeas relief. ROA.1647. Such retaliation would chill the speech, or its

distribution, of or by a person or entity of ordinary firmness, whether the targeted party demonstrated a change in behavior or not. *See, e.g.*, *Catalina*, 398 F.3d at 367 (subjecting a party "to criminal investigation with the substantial motivation of dissuading" protected activities violates the First Amendment). Netflix pled a sufficient injury to support a Section 1983 claim for First Amendment retaliation.

## CONCLUSION

For the foregoing reasons, *amici* respectfully request that the Court affirm the District Court's preliminary injunction and grant Netflix such other relief to which it is entitled.

///

///

///

///

///

///

///

///

///

///

///

Dated:  June 7, 2023                    By: */s/ Thomas S. Leatherbury*

                                      Thomas S. Leatherbury
                                          Texas Bar No. 12095275
                                      THOMAS S. LEATHERBURY LAW, PLLC
                                      Cumberland Hill School Building
                                      1901 N. Akard St.
                                      Dallas, TX 75201
                                      (214) 213–5004
                                      tom@tsleatherburylaw.com

                                      Michael L. Charlson
                                          California Bar No. 122125
                                      Robert H. Wu
                                          California Bar No. 344682
                                      VINSON & ELKINS LLP
                                      555 Mission Street, Suite 2000
                                      San Francisco, CA 94105
                                      (415) 979–6934
                                      mcharlson@velaw.com
                                      bwu@velaw.com

                                      Peter Steffensen
                                        Texas Bar No. 24106464
                                      SMU DEDMAN SCHOOL OF LAW
                                      FIRST AMENDMENT CLINIC
                                      P.O. Box 750116
                                      Dallas, TX 75275
                                      (214) 768–4077
                                      psteffensen@smu.edu

                                      *Attorneys for Amici Curiae First*
                                      *Amendment Scholars and Clinics*

# APPENDIX

**Cortelyou Kenney** is a nationally-recognized expert in First Amendment law. She previously served as the Associate Director of Cornell Law School's First Amendment Clinic, where she oversaw and litigated high stakes cases and secured major victories at the federal district, circuit, and state court levels involving freedom of information and of the press. Her scholarship has appeared or is forthcoming in the California Law Review, the Fordham Law Review, the Loyola Los Angeles Law Review, and the Cardozo Arts & Entertainment Law Journal. Ms. Kenney is also an Affiliated Fellow at the Information Society Project at Yale Law School, and has legal expertise in *Younger* abstention, having previously litigated *Younger* issues.

**Gregg Leslie** is a Distinguished Professor of Practice in Media Law and the Executive Director of the First Amendment Clinic at Arizona State University's Sandra Day O'Connor College of Law. Professor Leslie also currently serves on the governing committee of the Communications Law Forum of the American Bar Association. He was previously a staff attorney with the Reporters Committee for Freedom of the Press, a Washington, D.C. nonprofit association that provides legal assistance to journalists, and served as the organization's legal defense director for 17 years.

The **Stanton Foundation First Amendment Clinic at Vanderbilt Law School** and the **Southern Methodist University Dedman School of Law First Amendment Clinic** defend and advance freedoms of speech, press, assembly, and petition through court advocacy. The Clinics serve as an educational resource on issues of free expression and press rights and provides law students with the real-world practice experience to become leaders on First Amendment issues. The Clinics engage in advocacy and representation across the country and have an interest in promoting the sound interpretation of the First Amendment in a way that preserves the important freedoms of petition, assembly, and association afforded by the U.S. Constitution and subsequent court precedents.

## CERTIFICATE OF SERVICE

I certify that on June 7, 2023, I caused a true and accurate copy of the foregoing document to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit through the CM/ECF system. I certify that the participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Thomas S. Leatherbury*
*Attorney of Record for Amici Curiae*
*First Amendment Scholars and Clinics*

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.      This brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains **6,470** words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).  This figure is inclusive of the words in the Appendix of *amici* descriptions.

2.      This brief complies with the type-face requirements and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) and Fifth Circuit Rules 32.1 and 32.2 because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

> */s/ Thomas S. Leatherbury*
> *Attorney of Record for Amici Curiae*
> *First Amendment Scholars and Clinics*